## AUTEN v. UNITED STATES NATIONAL BANK OF NEW YORK.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 206. Argued.March 9, 1899. — Decided April 24, 1899.

In June, 1892, the United States National Bank of New York, by letter, solicited the business of the First National Bank of Little Rock, Arkansas. The latter, through its president, accepted the proposition, and opened business, by enclosing for discount, notes to a large amount. This business continued for some months, the discounted notes being taken up as maturing, until the Arkansas bank suspended payment, and went into the hands of a receiver. At that time the New York bank held notes to a large amount, which it had acquired by discounting them from the Arkansas bank. These notes have been duly protested for non-payment, and the payment of the fees of protest, made by the New York bank, have been charged to the Arkansas bank in account. The receiver refused to pay or allow them. At the time of the failure of the Arkansas bank there was a slight balance due it from the New York bank, which the latter credited to it on account of the sum which was claimed to be due on the notes after the refusal of the receiver to allow them. The New York bank commenced this suit against the receiver, to recover the balance which it claimed was due to it. The receiver denied all liability and asked judgment in his favor for the small balance in the hands of the New York bank. It was also set up that the notes discounted by the New York bank were not for the benefit of the Arkansas bank, but for the benefit of its president, and that the New York bank was charged with notice of this. The judgment of the trial court, which was affirmed by the Circuit Court of Appeals, was for the full amount of the notes, less the set-off. In this court motion was made to dismiss the writ of error on the ground that jurisdiction below depended on diversity of citizenship, and hence was final. *Held:*

(1) That the receiver, being an officer of the United States, the action against him was one arising under the laws of the United States, and this court had jurisdiction;

(2) That it was competent for the directors of the Arkansas bank to empower the president, or cashier, or both to indorse the paper of the bank, and that, under the circumstances, the New York bank was justified in assuming that the dealings with it were authorized, and were executed as authorized;

(3) That the set-off having been allowed by the New York bank in account, the receiver was entitled to no other relief.

Two of the parties to this action in the court below were national banks, one located at New York, the other located at Little Rock, Arkansas. Sterling R. Cockrill, as receiver of the latter bank, was also a party. He resigned and plaintiff in error was appointed. The banks will be denominated respectively the New York bank and the Little Rock bank.

The complaint contained the necessary jurisdictional allegations, and that on December 7, 1892, the City Electric Street Railway Company, a corporation organized and doing business under the laws of Arkansas, in the city of Little Rock, Arkansas, executed and delivered to G. R. Brown and H. G. Allis, citizens of the State of Missouri, its three promissory notes, each for five thousand dollars, payable four months after date, with interest at the rate of ten per cent per annum from maturity until paid : that said Brown and Allis afterwards indorsed and delivered said notes to the defendant First National Bank, and said bank before maturity and for a valuable consideration indorsed, rediscounted and delivered said notes to plaintiff : that on December 7, 1892, the McCarthy & Joyce Company, a corporation resident in the city of Little Rock, Pulaski County, Arkansas, and organized and doing business under the laws of Arkansas, executed and delivered to James Joyce, a citizen of the State of Missouri, its two promissory notes, each for five thousand dollars, payable to his order at four and five months respectively after date, with interest from maturity at the rate of ten per cent per annum until paid : that said Joyce afterwards indorsed said notes to the defendant First National Bank, and said bank before maturity and for a valuable consideration indorsed, rediscounted and delivered said notes to plaintiff : that said notes were each at maturity presented at the First National Bank in Little Rock, Arkansas,

for payment, and payment being refused, they were each duly protested for non-payment, the fees for which, amounting to twenty-five dollars, were paid by plaintiff. Copies of said notes, with the indorsements thereon, were thereto attached, marked 1 to 5 inclusive, and made part thereof. No part of said notes has been paid, and the same have been presented to the receiver of said bank for allowance, which he has refused to do.

Judgment was prayed for the debt and other relief.

Three of said notes are in the following form:

"$5000.        34131.        LITTLE ROCK, ARK., *Dec.* 7, 1892.

Four months after date we, or either of us, promise to pay to the order of G. R. Brown and H. G. Allis five thousand dollars, for value received, negotiable and payable, without defalcation or discount, at the First National Bank of Little Rock, Arkansas, with interest from maturity, at the rate of ten per cent per annum, until paid.

CITY ELECTRIC ST. R'Y CO.

W. H. SUTTON, *Sec'y.*        H. G. BRADFORD, *P't.*

No. A, 73485.    Due Apr. 7–10, '93."

The following indorsement appears on each: "Geo. R. Brown, H. G. Allis, First National Bank, Little Rock, Arkansas; H. G. Allis, P't.

Two of the notes were in the following form:

"$5000.        34128.        LITTLE ROCK, ARK., *Dec.* 7, 1892.

Four months after date we, or either of us, promise to pay to the order of James Joyce five thousand dollars, for value received, negotiable and payable, without defalcation or discount, at the First National Bank of Little Rock, Arkansas, with interest from maturity, at the rate of ten per cent per annum, until paid.

McCARTHY & JOYCE CO.

GEO. MANDLEBAUM, *Sec'y & Treas.*

A, 73477.    No. 2.    Due Ap'l 7–10, '93."

They were indorsed as follows: "James Joyce, H. G. Allis, First National Bank, Little Rock, Ar.; H. G. Allis, P't."

The receiver only answered, and his answer as finally amended denied that either of the notes described in the plaintiff's complaint was ever indorsed and delivered to the First National Bank; he denied that either of said notes was ever the property of or in the possession of said bank; and denied that the said bank ever indorsed or delivered either of said notes to the plaintiff; he denied that said bank ever received any consideration from said plaintiff for any indorsement or delivery of said notes to it; and averred that the name of the defendant bank was indorsed on said notes by H. G. Allis for his personal benefit without authority from said bank; that the said Allis, assuming to act for defendant bank, procured the plaintiff to advance or loan upon said notes a large sum of money, which he appropriated to his own use; that said Allis had no authority from said bank to negotiate said loan or to act for it in any way in said transaction; that if said transaction created an indebtedness against the defendant bank, then the total liability of said defendant bank to the plaintiff by virtue thereof exceeded one tenth of the plaintiff's capital stock, and the total liability of the defendant bank thereby exceeded the amount of its capital stock actually paid in; that the plaintiff knowingly permitted its officers to make such excessive loan under the circumstances aforesaid; that the transaction aforesaid was not in the usual course of banking business which either the plaintiff or the defendant bank was authorized to carry on; that the plaintiff was not an innocent holder of either of said notes; that the defendant bank received no benefit from said transaction; that it had no knowledge thereof until a few days prior to its suspension; that no notice of the dishonor of said notes was ever given to the defendant bank. Also that at the date of the suspension of the First National Bank the United States National Bank was indebted to it in the sum of $467.86, that sum then being on deposit in the said United States National Bank to the credit of the First National Bank of Little Rock; and that the same has never been paid.

The receiver prayed that "he be discharged from all liability upon the notes sued on herein, and that he have judg-

ment against the plaintiff for the said sum of $467.86, and interest from the 1st day of February, 1893."

The plaintiff bank denied the indebtedness of $467.86, and averred "that at the time said First National Bank failed it was indebted to plaintiff in a large amount, to wit, the notes sued upon herein, and plaintiff applied said $467.86 as a credit upon said indebtedness."

The issues thus made up were brought to trial before a jury. Upon the conclusion of the testimony the court, at the request of the plaintiff bank, instructed the jury to find a verdict for it, which the court did, and denied certain instructions requested by the defendant. The jury found for the plaintiff, as instructed, for the full amount of the notes sued, less the amount of the set-off, and judgment was entered in accordance therewith.

A writ of error was sued out to the Circuit Court of Appeals, which affirmed the judgment, and the case was brought here.

There had been two other trials, the rulings in which and the action of the Circuit Court of Appeals, are reported in 27 U. S. App. 605, and 49 U. S. App. 67.

The defendant assigned as error the action of the Circuit Court in instructing the jury to find for the plaintiff bank and in refusing the instructions requested by the defendant. The latter were nineteen in number, and presented every aspect of the defendant's defence and contentions. They are necessarily involved in the consideration of the peremptory instruction of the court, and their explicit statement is therefore not necessary.

The evidence shows that the New York bank solicited the business of the Little Rock bank by a letter written by its second assistant cashier, directed to the cashier of the Little Rock bank, and dated June 21, 1892.

Among other things the letter stated "If you will send on $50,000 of your good, short-time, well-rated bills receivable, we will be pleased to place them to your credit at 4 per cent."

The reply from the Little Rock bank came not from its cashier, but from its president, H. G. Allis, who accepted the offer and enclosed notes amounting to $50,728, among which

were three of the City Electric Railway Company, the maker of three of the notes in controversy. When first forwarded they were not indorsed, and had to be returned for indorsement. They were indorsed, and the letter returning them was signed by Allis. To the letter forwarding them the New York bank replied as follows:

"NEW YORK, *June* 27, 1892.

H. G. Allis, Esq., President, Little Rock, Ark.

DEAR SIR: We have this day discounted the following notes contained in favor of the 24th inst., and proceeds of same placed to your credit."

The notes were enumerated, their amounts calculated and footed up and discount at 4 per cent deducted, and the proceeds, amounting to $50,216.48, placed to the credit of the Little Rock bank.

On July 6, 1892, the following telegrams were exchanged:

"New York, *July* 6, 1892.

First National Bank, Little Rock, Ark.:

Will give you additional fifty thousand on short-time, well-rated bills discounted at five per cent. Money rates are little firmer. Answer if wanted.

U. S. NAT. BANK."

"LITTLE ROCK, ARK., *July* 6, 1892.

United States Nat. Bank, N.Y.:

We can use fifty thousand dollars additional at five per cent; will send bills to-morrow.

FIRST NAT. BANK."

In accordance with the proposition thus made and accepted, H. G. Allis, as president, wrote on the 9th of July, 1892, to the New York bank a letter, enclosing what he denominated "prime paper, amounting to $50,301.88," and requested proceeds to be placed " to our credit and advise." These notes were discounted and acknowledged. Their proceeds, less discount, amounted to $49,641.68.

On July 26, 1892, the New York bank telegraphed:

"NEW YORK, *July* 26, 1892.

First National Bank, Little Rock, Ark.:

Can take fifty thousand more of your well-rated bills discounted at five per cent.        U. S. NAT. BANK."

To this H. G. Allis, as president, answered as follows:

"LITTLE ROCK, ARK., *July* 29, 1892.

United States National Bank, New York city.

GENTLEMEN: Your telegram of the 26th, saying you could take $50,000 more short-time, well-rated paper, I placed before our board to-day.

While it is two weeks earlier than we need it, on account of the rate we will take it now, and I enclose herein paper as listed below; amount, $50,089.93.

Yours very truly,        H. G. ALLIS, *President.*

We hold collaterals subject to your order; see (pencil) notations on paper for rating.        H. G. ALLIS, *Pr.*"

In the list of notes were two by the City Electric Street Railway Company and two by the McCarthy & Joyce Co., who were the makers of two of the notes in controversy. There was one by N. Kupferle for $5000, "due Nov. 8, 1892." The significance of this will be stated hereafter.

These notes were discounted and the fact communicated to H. G. Allis, Esq., president, Little Rock, Ark.

The next letter contains notes for discount from the Little Rock bank, sent by its cashier, W. C. Denney. The proceeds amounted to $24,413.05, acknowledgment of which was made.

The next communication was about the notes in controversy. It was dated November 25, 1892, and was signed by W. C. Denney, cashier. The letter, however, enclosing the notes was sent by H. G. Allis, as president. The correspondence is as follows:

"The First National Bank of Little Rock, Ark.

Nov. 25, 1892.

United States National Bank, New York city.

GENTLEMEN: Kindly advise us if you can give us $25,000

more in discounts. We have not decided whether we will make further discounts this year, although it is more than probable that we will have to, as our cotton men do not want to sell at present.

We believe the advance in price will cover shortage of crop, and that our collections will be equal to those of last year. If our cotton men continue to hold their cotton, it will be necessary for us to make further rediscounts, and we want to know what we can do in case they refuse to sell.

If you can grant us this favor, kindly let us know what rate of interest you will want. Your immediate reply is requested.

Yours very truly,                    W. C. DENNEY, *Cashier.*"

"NEW YORK, *Nov.* 28, 1892.

Mr. W. C. Denney, Cashier, Little Rock, Ark.

DEAR SIR: Yours of the 25th is to hand.

We will give you the additional discounts as requested. You may send on your paper, and we will put same to your credit at 6 %.

Yours very truly,                    H. C. HOPKINS, *Cashier.*"

"LITTLE ROCK, ARK., *Dec.* 13, 1892.

United States Nat. Bank, New York city.

GENTLEMEN: In accordance with our letter of the 25th ult., and your reply of the 28th ult., we find that we shall need some more money, as our cotton men are not shipping out any cotton. It seems to be the inclination of all of them to hold for a better price, and we are now carrying $175,000 in demand loans on cotton, which we may have to carry two or three months longer.

We enclose herein paper as scheduled below. Kindly wire us proceeds to our credit, and oblige,

Yours, very truly,        H. G. ALLIS, *President.*

| | |
|---|---:|
| Dickenson Hardware Co., due March 3.......... | $2,500 00 |
| Dickenson Hardware Co., due April 6........... | 5,000 00 |
| City Electric St. R'y Co., due April 10.......... | 5,000 00 |
| *Carried forward,* | $12,500 00 |

|  |  |
|---|---|
| *Brought forward,* | $12,500 00 |
| City Electric St. R'y Co., due April 10 ........... | 5,000 00 |
| City Electric St. R'y Co., due April 10 .......... | 5,000 00 |
| McCarthy & Joyce Co., due May 10 ............ | 5,000 00 |
| McCarthy & Joyce Co., due April 10 ........... | 5,000 00 |
|  | $32,500 00 |

We hold all collaterals recited subjected to your order and for your account."

"NEW YORK, *Dec.* 16, 1892.

H. G. Allis, Esq., Pres't, Little Rock, Ark.

DEAR SIR: We have this day discounted the following notes contained in your favor of the 13th inst., and proceeds of same placed to your credit:

| Dickenson H'ware Co., due M'ch 3, '93. | $2,500 | disc't | $32 08 |
|---|---|---|---|
| Do.    do.    " Ap'l 6, '93. | 5,000 | " | 92 50 |
| City Electric St. R'y Co. "   " 10, . | 5,000 | " | 95 83 |
| "        "       " 10, . | 5,000 | " | 95 83 |
| Do.    do.       " 10, . | 5,000 | " | 95 83 |
| McCarthy & Joyce Co.    " 10, . | 5,000 | " | 95 83 |
| Do.    do.       May 10, . | 5,000 | " | 120 83 |

| | |
|---|---|
| Amount of notes.................... | $32,500 |
| Less discount at 6%................. | 628 73 |
| Proceeds .................... | $31,871 27 |

We enclose herewith note of Dickenson Hardware Co. $5000 due Ap'l 6th for insertion of amount in body' and return to us.

Yours truly,    JNO. J. MCAULIFFE,
*Ass't Cashier.*"

"NEW YORK, *December* 17, 1892.

First National Bank, Little Rock, Arkansas:

Letter thirteen received notes discounted proceeds credited account.

UNITED STATES NATIONAL BANK."

" The First National Bank of Little Rock, Ark.
                                        *Dec.* 20, 1892.
United States National Bank, New York city.

GENTLEMEN : We have your favor of the 16th inst., enclosing the Dickenson Hardware Company note for completion, which w‧ herewith return.

We charge your account with $31,871.27, proceeds of $32,500.00 of discounts.

          Yours very truly,       W. C. DENNEY, *Cashier.*"

In the subsequent correspondence Allis takes part but once, and sent the following telegram December 21, 1892 :

          "LITTLE ROCK, ARK., *Dec.* 21, 1892.
U. S. Nat'l Bank, N.Y. :

Can you discount thirty thousand country banks' paper secured by cotton thirty days no renewal desire to carry over holidays answer day message ?

          H. G. ALLIS, *President.*"

Henry C. Hopkins, cashier of the New York bank, was called as a witness in its behalf, and after explaining the letters and telegrams which were sent by the banks, and the transactions which they detailed, testified that the dealings between the banks were such as take place between banks carrying on legitimate banking business, in the usual course of business, and that the notes were not discounted in any other way, and that the bank had no notice or intimation that the notes had not been regularly received by the First National Bank or offered by it in the regular course of business or for the benefit of any person other than the bank or interested in the proceeds, and that the United States National Bank in its correspondence and dealings did not recognize H. G. Allis, W. C. Denney or S. S. Smith personally or in any capacity than as representing the First National Bank ; and that the transactions were solely with the First National Bank ; and that the correspondence and transactions were usual for the president and cashier of a United States

national bank to carry on; and that the proceeds of the various discounted notes were withdrawn by the Little Rock bank in the regular course of business by its officers.

There was a detailed statement of the transactions between the banks attached to Hopkins' deposition which is not in the record, but instead thereof there appears the following:

"The account current here referred to began June 27, 1892, and continued until the suspension of business of the First National Bank. It shows almost daily entries of debit and credit. It shows that the several notes discounted by the United States National Bank and referred to in the depositions of the officers of that bank, being forty-nine in number, were charged against the account of the First National Bank by the United States National Bank at the several dates of their maturity. In two thirds of the instances where such charges were made the balance to the credit of the First National Bank on the books of the United States National Bank was sufficient to cover the charge. In other instances the balance to the credit of the First National Bank was insufficient to meet the charge at the time of the entry, and in the other instances the account of the First National Bank was in overdraft as shown by the books of the United States National Bank at the time the charge was made.

" The account shows that at the time of the suspension of the First National Bank the latter bank had a credit of $467.86 upon the books of the United States National Bank. Against this balance the notes in suit with protest fees were charged on the account April 17 and May 15, 1893, making the account show a balance in favor of the United States National Bank of $24,558.03.

" This is the paper marked '77' referred to in the depositions of Henry C. Hopkins, James H. Parker, Joseph W. Harriman and John J. McAuliffe, hereto annexed."

The record also shows that " J. H. Parker, president, Joseph W. Harriman, second assistant cashier, and John J. McAuliffe, assistant cashier, each testified to identically the same facts in the identical language as Henry C. Hopkins, and it is agreed that the depositions of Hopkins shall be treated as the deposi-

tion of each of the said witnesses without the necessity of copying the deposition of each witness."

There was proof made of the protest of the notes.

There was testimony on the part of the plaintiff showing that it was the custom of the banks at Little Rock to rediscount through their presidents and cashiers until after a decision in the *National Bank case* of Cincinnati in January, 1893; after that it was done by resolution of the board of directors, and the banks of New York and other commercial cities commonly require that now.

By a witness who was cashier of the Little Rock bank from November, 1890, to October, 1891, Allis then being president, it was shown that it was the custom of the bank as to rediscounting notes for the cashier or assistant cashier to refer them to the president, and the president generally directed what amount and where to send them. Whether they were referred to the board of directors, the witness was unable to say.

On cross-examination the witness testified that when the discounts were determined on, the cashier or assistant cashier transacted the business. He, however, only remembered sending off one lot of discounts, Mr. Denney, the assistant cashier, usually carrying on the correspondence. He did not remember that the president ever did anything of that kind. "Either Mr. Denney or I would say to him that something of the kind was needed, and he would direct the quantity and what correspondents usually to send to."

There were introduced in evidence "the reports or statements by the bank to the Comptroller of the Currency, showing the rediscounts and business of the bank, of date May 17, 1892, and July 12, 1892, as follows: The report of May 17 was sworn to by W. C. Denney, cashier, and attested by James Joyce, E. J. Butler and H. G. Allis, directors, and showed 'notes and bills rediscounted, $16,132.40.' The report of July 12 was sworn to by H. G. Allis, president, and attested by Charles T. Abeles, E. J. Butler and John W. Goodwin, directors, and showed notes and bills rediscounted, $81,748.80."

The testimony on the part of the plaintiff in error showed

(we quote from brief of defendant in error) that "the notes never belonged to the First National Bank; that the three notes of the Electric Street Railway Company were executed to Brown and Allis for accommodation of Allis, and the two notes of McCarthy & Joyce Company were executed and delivered to Allis for the purpose of raising money for the company to be placed to its credit with the First National Bank, to which McCarthy & Joyce Company was indebted; that neither of the notes was ever passed upon by the discount board of the bank or appeared on the books of the bank; that after the bank was notified that the notes had been discounted and placed to its credit, Allis directed the proceeds of the notes ($25,000) to be placed to his credit on the books of the bank, at which time there was an overdraft against him of $10,679.44; that Allis was at that time indebted to the Little Rock bank on individual notes for at least $50,000, and was continuously thereafter indebted to the bank until its failure."

As to the power of the president to direct rediscounts or to indorse the notes of the bank, E. J. Butler, N. Kupferle and C. T. Abeles, who were directors of the bank at the time of the transactions between it and the New York bank, testified respectively as follows:

"(Butler): Was a pretty regular attendant at the board meetings during the year — at nearly all the meetings.

"Q. Did Mr. Allis have authority to discount notes for the bank or to rediscount them?

"A. Never that I knew of. I knew that when Colonel Roots was president he asked and received authority from the board to make rediscounts, but I do not know that Mr. Allis ever asked, and the board, when I was present — he never was given any authority to make rediscounts for the bank.

"Q. Did he have authority from the bank to indorse its papers for rediscount?

"A. No, sir; never that I was aware of."

On cross-examination he testified that he did not recollect of Allis asking for authority; that the question never came before the board as to discounts. He knew that there were dis-

counts made, but did not recollect any particular ones, but in case there were he would suppose they were on the authority of the board, given in his absence, but did not remember that the question was brought up at all.

"Q. There are a couple of statements made by the bank (being the statements heretofore introduced by the plaintiff) of May 17, 1892, and July 12, 1892, to which you as a director certify, which show, one of May 17 shows rediscounts, $16,172.40, and the one of July 12, 1892, shows rediscounts, $81,748.88. Did you sign these?

" A. I couldn't say without referring to the original reports.

" Q. These are the published reports, are they not?

" A. They purport to be the published report, but I do not know anything about it. I was one of the directors at that time.

" Q. That is one of the usual forms of the reports published in the papers, isn't it?

" A. Yes, sir.

" Q. You now tell the jury that you do not know anything about the extent of rediscounts made by it?

" A. No, sir; I cannot remember."

Mr. Denney was cashier in 1892, and he supposed that Denney transacted the business as to indorsements and rediscounting, but did not know and did not recollect that Allis did. Did not hear of him indorsing the notes in suit until after the bank failed.

"(Kupferle): Mr. Allis did not have the power from the board of directors of the bank to indorse its papers for rediscount.

" Cross-examination: There was nothing said in the board about such power. The question was not brought before the board. The bank during that time rediscounted paper. The cashier generally attended to that. I knew that the bank was discounting paper. I recall once where the president requested of the board that the bank should borrow some money. That was in the fall of 1892. I knew that the bank had been discounting paper long before that and borrowing money before

that, and no authority had been asked of the board to do it. I knew that they were borrowing money and rediscounting paper continually.

"Redirect: We had eleven or thirteen members of the board of directors; I forget which. Never less than eight or nine. There was seldom a meeting when all were present — a majority present.

"Q. Did they at any time rediscount, or authorize the rediscounting of paper? Did they have that authority?

"A. No, sir; that was not their business.

"Q. Theirs was to discount paper for customers of the banks?

"A. The daily offerings, yes, sir."

Did not know of Mr. Allis indorsing the name of the bank upon the paper for the purpose of rediscounting it.

"Q. Did you, as a member of the board of directors, or otherwise, have any information that Mr. Allis was using the name of the bank upon his or other people's paper, for accommodation?

"A. No, sir; I never did.

"Cross-examination:

"Q. You didn't know he was using the name of the bank on the bank's paper?

"A. No, sir.

"Q. You knew he was discounting paper?

"A. No, sir; it was not his place.

"Q. Didn't the correspondence there show he was sending the paper for discount all over the country?

"A. No, sir; I don't know anything about that.

"Q. Wasn't it your business to know it?

"A. I do not know.

"Q. You was vice president and one of the directors?

"A. Yes, sir. I never knew anything about it until the failure of the bank — that he ever used the bank's name."

"(Abeles): Not while I was there (at the meetings of the board) was authority given to Allis as president to indorse or rediscount the notes of the bank. I do not think it was ever mentioned. I knew of the bank rediscounting paper, and

somebody was transacting that part of the business. I think I inquired of some of the directors who it was, and was told that the authority vested in the cashier. I do not recollect that I inquired of Allis or Denney."

"[Cohn] was not a director in 1892 — was for ten years prior to that time, and Allis was president in 1891, but did not recollect that he had authority from the board to indorse its paper or to rediscount it.

"Cross-examination: Knew that rediscounting was being done, but supposed it was being done by the cashier — didn't stop to inquire.

"Redirect:

"Q. Who was authorized in the bank to perform that duty?

"A. I understood the cashier.

"Cross-examination:

"Q. How was he authorized?

"A. By law.

"Q. You are simply giving your legal opinion?

"A. Well, I understood that was his authority."

Other facts are stated in the opinion of the court.

Upon filing the record the defendant in error made a motion to dismiss, which was postponed to the consideration of the merits.

*Mr. Sterling R. Cockrill* for plaintiff in error.

*Mr. John Fletcher* for defendant in error. *Mr. W. C. Ratcliffe* was on his brief.

MR. JUSTICE MCKENNA, after making the above statement, delivered the opinion of the court.

1. To sustain the motion to dismiss, it is contended that the jurisdiction of the case depends on diversity of citizenship, and hence that the judgment of the Circuit Court of Appeals is final. But one of the defendants (plaintiff in error), though a citizen of a different State from the plaintiff in the action

(defendant in error), is also a receiver of a national bank appointed by the Comptroller of the Currency and is an officer of the United States, and an action against him is one arising under the laws of the United States. *Kennedy* v. *Gibson*, 8 Wall. 498; *In re Chetwood*, 165 U. S. 443; *Sonnentheil* v. *Christian Moerlein Brewing Co.*, 172 U. S. 401. It is, however, urged that such appointment was not shown. It was not explicitly alleged, but we think that it sufficiently appeared, and the motion to dismiss is denied.

2. Against the correctness of the action of the Circuit Court in instructing a verdict for the New York bank, it is urged that the discounting of the notes in controversy was for the personal benefit of Allis, and that the New York bank was charged with notice of it because of the nature of the transaction, the form of the notes and the order of the indorsements, and also because notice was a question of fact to be decided by the jury on the evidence.

It is also contended that the receiver was entitled to a judgment on the set-off. We will examine each of the propositions.

1. The argument to sustain this is that the facts detailed constitute borrowing money, and that borrowing is out of the usual course of legitimate banking business; and one who loans must at his peril see that the officer or agent who offers to borrow for a bank has special authority to do so. But is borrowing out of the usual course of legitimate banking business?

Banking in much, if not in the greater part of its practice, is in strict sense borrowing, and we may well hesitate to condemn it as illegitimate, or regard it as out of the course of regular business, and hence suspicious and questionable. "A bank," says Morse, (sec. 2, Banks and Banking,) "is an institution usually incorporated with power to issue its promissory notes intended to circulate as money (known as bank notes); or to receive the money of others on general deposit to form a joint fund that shall be used by the institution *for its own benefit,* for one or more of the purposes of making temporary loans and discounts; of dealing in notes, foreign and domestic

bills of exchange, coin, bullion, credits and the remission of money ; or with both these powers, and with the privileges in addition to these basic powers, of receiving special deposits and making collections for the holders of negotiable paper, if the institution sees fit to engage in such business."

This defines the functions: what relations are created by them ?   Manifestly those of debtor and creditor — the bank being as often the one as the other.

A banker, Macleod says, is a trader who buys money, or money and debts, by creating other debts, which he does with his credit — exchanging for a debt payable in the future one payable on demand.   This, he says, is the essential definition of banking.   "The first business of a banker is not to lend money *to* others but to collect money *from* others." (Macleod on Banking, vol. 1, 2d ed. pp. 109, 110.)   And Gilbart defines a banker to be "a dealer in capital, or more properly a dealer in money.   He is an intermediate party between the borrower and the lender.   He borrows of one party and lends to another."   (Gilbart on Banking, vol. 1, p. 2.)

The very first banking in England was pure borrowing.   It consisted in receiving money in exchange for which promissory notes were given payable to bearer on demand, and so essentially was this banking as then understood, that the monopoly given to the Bank of England was secured by prohibiting any partnership of more than six persons "to borrow, owe or take up any sum or sums of money on their bills or notes payable at demand."   And it had effect until 1772, (about thirty years,) when the monopoly was evaded by the introduction of the deposit system.   The relations created are the same as those created by the issue of notes.   In both a debt is created — the evidence only is different.   In one case it is a credit on the banker's books ; in the other his written promise to pay.   In the one case he discharges it by paying the orders (cheques) of his creditor ; in the other by redeeming his promises.   These are the only differences.   There may be others of advantage and ultimate effect, but with them we are not concerned.

But it may be said these views are elementary and do not

help to a solution of the question presented by the record, which is not what relation a bank has or what power its officers may be considered as having in its transactions with the general public, but what is its relation and what power its officers may be considered as having in its transactions with other banks.  Indeed, the question may be even narrower — not one of power, but one of evidence.  If so, the views expressed are pertinent.  They show the basis of credit upon which banks rest, and the necessity of having power to support it; it may be to extend it.  Borrowing is borrowing, no matter from whom.  Discounting bills and notes may require rediscounting them; buying bills and notes may require selling them again.  Money may not be equally distributed.  It is a bank's function to correct the inequality.  The very object of banking is to aid the operation of the laws of commerce by serving as a channel for carrying money from place to place, as the rise and fall of supply and demand require, and it may be done by rediscounting the bank's paper or by some other form of borrowing.  *Curtis* v. *Leavitt*, 15 N. Y. 1; *First National Bank* v. *National Exchange Bank*, 92 U. S. 122; *Cooper* v. *Curtis*, 30 Maine, 488.

A power so useful cannot be said to be illegitimate, and declared as a matter of law to be out of the usual course of business, and to charge everybody connected with it with knowledge that it may be in excess of authority.  It would seem, if doubtful at all, more like a question of fact, to be resolved in the particular case by the usage of the parties or the usage of communities.

It is claimed, however, that *Western National Bank* v. *Armstrong*, 152 U. S. 346, establishes the contrary, and decides the proposition contended for by the plaintiff in error.  We do not think it does.  Some of its language may seem to do so, but it was used in suggestion of a question which might be raised on the facts of the case, without intending to authoritatively decide it.  The facts of that case are different from the facts of the pending one, and in response to its citation we might rest on the difference.  But plaintiff in error urges the case so earnestly and confidently that we have considered

it better to answer the argument on which it is asserted to be based and remove misapprehension of the extent of the decision.

2. Did the form of the notes or the order of indorsements charge the New York bank with inquiry of Allis' authority or with knowledge of his use of them for his personal benefit?

It may be conceded that an individual negotiating for the purchase of a bill or note from one having it in possession, and whose name is upon it, must assume that the title of the holder, as well as the liability of all prior parties, is precisely that indicated by the paper itself. These principles are established by *West St. Louis Savings Bank* v. *Shawnee County Bank*, 95 U. S. 557; *Central Bank of Brooklyn* v. *Hammett et al.*, 50 N. Y. 158; *New York Iron Mine* v. *Negaunee Bank*, 39 Michigan, 644; *Lee* v. *Smith*, 84 Missouri, 304; *Park Hotel Co.* v. *Fourth National Bank*, 86 Fed. Rep. 742; *Claflin* v. *Farmers' & Citizens' Bank*, 25 N. Y. 293.

But it is not meant that circumstances may not explain the notes or may not relieve the taker from the obligation of inquiry. If the order of indorsements and Allis' official position and his relation to the notes were circumstances to be considered, they were not necessarily controlling against all other circumstances, and compelled inquiry as a peremptory requirement of law.

3. In judging of the conduct and rights of the New York bank the question is not what actual authority Allis had, but what appearance of authority he had, or, rather, what appearance of authority he was given or permitted by the directors.

In the inquiry there is involved the two preceding propositions as questions of fact, or of mixed law and fact. The first — the power of a bank to rediscount its paper — as to what the course of dealing of the contending banks was; the second — the form of the notes and their order of indorsements as notice — whether relieved by the circumstances which attended them and the transactions which preceded them.

The evidence shows that it was not only the custom of the defendant bank to rediscount its paper, but that it was

the custom of the other banks at Little Rock to do so, and the officers of the New York bank testified as follows:

" Q. Were there any of the dealings between said banks (the parties to this action) other than such as take place between banks carrying on a legitimate banking business, in the usual course of business?

" A. No.

" Q. Were the correspondence and transactions carried on by H. G. Allis and W. C. Denney, as you have disclosed, such as are usual for the president and cashier of a United States national bank to carry on and exercise?

" A. Yes."

This testimony certainly has very comprehensive scope, and there is no contradiction of it. It must be received, at least, as establishing that, as between the contending banks rediscounting paper was in the usual course of their business, and that besides it was the usual course of business in their respective localities. Therefore the discounting of the notes in controversy carried the sanction of such business.

It is contended that the notes gave notice of the want of authority to rediscount them because the indorsement of the bank followed that of Allis, and hence showed that the bank was an accommodation indorser, and because the indorsement of the bank was by its president and not by its cashier.

The order of indorsements did not necessarily import that the Little Rock bank was an accommodation indorser. The order was a natural one if the notes had been discounted in the regular course of business. It is not contended that a want of power precluded the bank from discounting the notes of its officers. It had been done for one of the directors, and his note was rediscounted by the New York bank. It had an example therefore in the dealings of the parties, and, besides, was neither wrong nor unnatural of itself. But it was further relieved from question, and any challenge in the indorsements was satisfied by the circumstances.

It is to be remembered that the discounting the notes in controversy was not the only transaction between the banks. It was one of many transactions of the same kind. They

justified confidence, and it was confirmed by the manner in which the notes were presented. It is conceded that the cashier had the power to rediscount the bank's paper, and it was he who solicited the accommodation on account of which the notes were sent to the New York bank. The notes themselves, it is true, were sent by Allis, but expressly on the part of the bank, and subsequent correspondence about them was conducted with the cashier, as we have seen. And there could have been no misunderstanding. The letter of the New York bank which the cashier of the Little Rock bank answered was specific in the designation of the notes, their sum and the proceeds of the discount, and returned one of the notes not in controversy to be corrected. To this the cashier replied:

"*Dec.* 20, 1892.

United States National Bank, New York city.

GENTLEMEN: We have your favor of the 10th inst., enclosing the Dickenson Hardware Company note for completion, which we herewith return.

We charge your account with $31,871.27 proceeds of $32,500.00 of discounts.

Yours very truly,          W. C. DENNEY, *Cashier.*"

Notice was therefore brought to him and to the bank of the transaction and almost inevitably of its items. Was he deceived as to the notes which had been sent? It is not shown nor is it suggested how such deception was possible, and a presumption of ignorance cannot be entertained. Therefore, if the discounts he wrote about in his letter of the 20th of December were not in pursuance of those he had requested in his letter of November 25, he ought to have known and ought to have so said. If he had so said, the New York bank could have withdrawn the credit it had given, and Allis' wrong could not have been committed.

The strength of these circumstances cannot be resisted. Against them it would be extreme to say that the New York bank was put to further inquiry. Of whom would it have inquired? Not of Allis, the president of the Little Rock

bank, because his authority would have been the subject of inquiry. Then necessarily of the cashier; but from the cashier it had already heard. He began the transaction; he acknowledged its close, accepting the credit which had been created for the bank of which he, according to the argument, was the executive officer. We can discover no negligence on the part of the New York bank. The dealing with the notes in controversy came to it with the sanction of prior dealings with other notes. It was conducted with the same officers. It was no more questionable. The relation of Allis to it, we have seen, was not unnatural, and if the indorsement of other notes was not shown to be by him, it was not shown not to have been by him. The testimony of the officers of the New York bank was that the notes were received and discounted in the regular course of business, and in no way different from the other notes discounted by it for the Little Rock bank, and that they knew the notes were properly indorsed by one of the duly authorized officers of the First National Bank; but as the notes were not in their possession, they were unable to state the name of the officer. The testimony opposed to this, if it may be said to be opposed, is negative and of no value. Some of the directors testified that Allis did not have the power nor did they know of his having indorsed the bank's paper for rediscount. They knew, however, that the bank's paper was rediscounting in large amounts, and that money was borrowing continually, but they scarcely made an inquiry, and one of them testified that only in a single instance did Allis request the board for power to borrow money. The instance is not identified, except to say that it was in the fall of 1892. Of whom, in what amount, whether the request was granted or denied, what inquiry was made, what review of the business of the bank was made, there was absolute silence about. They surrendered the business absolutely to the president and cashier, and intrusted the manner of the execution to them. This court said by Mr. Justice Harlan, in *Martin* v. *Webb*, 110 U. S. 7, 15: "Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on

around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers. They have something more to do than from time to time to elect the officers of the bank and to make declaration of dividends. That which they ought by proper diligence to have known as to the general course of business in the bank, they may be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business."

Under section 5136, Revised Statutes, it was competent for the directors to empower the president or cashier, or both, to indorse the paper of the bank, and, under the circumstances, the New York bank was justified in assuming that the dealings with it were authorized and executed as authorized. *Briggs* v. *Spaulding*, 141 U. S. 132; *People's Bank* v. *National Bank*, 101 U. S. 181; *Davenport et al.* v. *Stone*, 104 Michigan, 521; *First National Bank of Kalamazoo* v. *Stone*, 106 Michigan, 367; *Houghton* v. *The First National Bank of Elkhorn*, 26 Wisconsin, 663; *Thomas* v. *City National Bank of Hastings*, 40 Nebraska, 501.

4. Set-off is the discharge or reduction of one demand by an opposite one. That of plaintiff in error was so applied and the amount due on the notes reduced. He was entitled to no other relief.

*Scott* v. *Armstrong*, 146 U. S. 499, does not apply. In that case it was held that a debtor of an insolvent national bank could set off against his indebtedness to the bank, which became payable after the bank's suspension, a claim payable to him before the suspension. And it was further held that the set-off was equitable, and therefore not available in a common law action.

But in this case the plaintiff in error pleaded the set-off. His right to do so was derived from the law of Arkansas, and that law provided: "If the amount set off be equal to the plaintiff's demand, the plaintiff shall recover nothing by his action; if it be less than the plaintiff's demand, he shall have

judgment for the residue only." Gould's Arkansas Digest of Statutes, c. 159, § 5, p. 1020. The law was complied with.

It follows that the Circuit Court did not err in instructing the jury to find for the plaintiff (defendant in error), and judgment is

*Affirmed.*