## McCARTNEY et al. v. EARLE.

### (Circuit Court of Appeals, Third Circuit. April 21, 1902.)

### No. 6.

1. JURISDICTION OF FEDERAL COURTS—SUIT BY RECEIVER OF NATIONAL BANK.
   A suit brought by the receiver of a national bank, by direction of the comptroller of the currency, to enforce a liability due to the bank, and to secure a sale under the order of the court of pledged securities, constituting a considerable part of its assets, is one for winding up the affairs of the bank, within the meaning of the proviso to section 4 of the federal judiciary act of 1888, and within the jurisdiction of a circuit court of the United States, without regard to the citizenship of the parties.[1]

2. FRAUDULENT CONVEYANCE—NECESSITY OF RECORDING — CONVEYANCE IN TRUST UNDER PENNSYLVANIA STATUTE.
   The provision of Act Pa. March 24, 1818, requiring all assignments in trust by debtors on account of inability at the time to pay their debts to be recorded within 30 days, and declaring them to be void if not so recorded, does not apply to a transfer made directly to a creditor for his benefit alone; and the transfer of property to the receiver of a national bank to secure a debt due to the bank is, in effect, one to the bank itself; and not in trust, and is not within the statute.

3. SAME—PREFERENTIAL CONVEYANCE—FRAUDULENT INTENT.
   No presumption of a fraudulent intent to hinder and delay other creditors arises from a transfer of property as security to a bona fide creditor, whose debt is due, although it is understood by the parties that the effect of the transfer will be to give such creditor a preference; nor can such an intent be inferred from a provision of the instrument of transfer that the property shall be returned in case a certain contemplated adjustment of the affairs of the debtor shall be made, which provision is favorable to other creditors.

---

[1] See Banks and Banking, vol. 6, Cent. Dig. § 1059.

**4. SAME.**

Evidence *held* insufficient to establish the invalidity of a transfer of property by an insolvent debtor to the receiver of a national bank by way of security for a debt due the bank, either on the ground of undue influence, duress, a fraudulent intent to hinder and delay creditors, or the insanity of the debtor.

**5. RECEIVER OF NATIONAL BANK—DEALINGS WITH PLEDGED SECURITIES.**

An instrument assigning certain shares of stock and bonds to the receiver of a national bank to secure a debt from the assignor to the bank, subject to certain prior pledges of a portion of the stock and bonds, in terms vested the receiver with "the rights of an owner, so far as regards sale, disposition, and management." *Held,* that dealings with the stock and bonds by the receiver after the assignor's death, with the approval of the controller, by which a forced sale was prevented by prior pledgees, and all parties in interest were benefited, could not be attacked in equity by the assignor's administrator because he did not assent to the same.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

For opinions below, see 109 Fed. 13, 112 Fed. 372.

George Tucker Bispham and J. Howard Gendell, for appellants.

Austin Lynch, John G. Johnson, Charles Biddle, and Asa W. Waters, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

DALLAS, Circuit Judge. This was a suit in equity in the circuit court for the Eastern district of Pennsylvania. It was brought in February, 1899, by the receiver of an insolvent national bank, by direction of the comptroller of the currency, to enforce a liability due to the bank, and to dispose of a considerable part of its assets. It was of the class of "cases for winding up the affairs of any such bank," which is excepted from the operation of section 4 of the act of August 13, 1888 (25 Stat. 433); and as it was commenced by an officer of the United States, in pursuance of the direction of another officer thereof, the circuit court was unquestionably right in taking and retaining jurisdiction of it. Armstrong v. Trautman (C. C.) 36 Fed. 276; Stephens v. Bernays (C. C.) 44 Fed. 642; Yardley v. Dickson (C. C.) 47 Fed. 835; Fisher v. Yoder (C. C.) 53 Fed. 565; Ex parte Chetwood, 165 U. S. 443, 17 Sup. Ct. 385, 41 L. Ed. 782; Auten v. Bank, 174 U. S. 125, 19 Sup. Ct. 628, 43 L. Ed. 920. The cause was so proceeded with that on March 7, 1900, a master was appointed, with instructions which were not then objected to, and are not now complained of. The proceedings in the master's office conformed to those instructions, and the decree of the circuit court was based on his report. The specific averments of error all go to the dismissal of the exceptions of the administrator of William M. Singerly's estate to that report; and upon the questions raised by them, as condensed in the brief submitted on his behalf, the appeal to this court is now for decision.

The decree appealed from was admittedly erroneous, if, for any reason, George H. Earle, Jr., as receiver, did not, under and by virtue of a certain instrument of writing, acquire title to the equities of

William M. Singerly in and to the shares and bonds of the Record Publishing Company, therein referred to. That instrument is as follows:

° For value received, I, William M. Singerly, of the city of Philadelphia and state of Pennsylvania, do hereby sell, assign. set over, and transfer unto George H. Earle, Jr., receiver of the Chestnut Street National Bank, all my right, title, and interest of, in, and to all and every share of the capital stock and bonds of the Record Publishing Co., whether now pledged or unpledged, and subject only to the lien of debts where the same has been pledged as collateral security, upon the following terms and conditions:

The purpose of this assignment is to further secure my indebtedness to the Chestnut Street National Bank; but it is made upon the express condition and reservation that can a plan of reorganization of the affairs of the Chestnut Street National Bank, the Chestnut Trust and Saving Fund Co., and of myself, and allied interests, be drafted and put in force, similar in its provisions and to the same general effect as the Singerly plan so called, and only deviating therefrom in such particulars as shall obtain the approval of the counsel of the said bank and said Trust Co., said counsel being John G. Johnson, Esq., William H. Addicks, J. Howard Gendell, and P. F. Rothermel, or the survivors of them, whether said proposed plan be a new one, or an amendment of the said Singerly plan, then and in that case, and in that case only, the Chestnut Street National Bank shall be bound to relinquish the additional security hereby transferred, upon the receipt, in substitution and lieu thereof the proposed shares of Record stock coming to it under the said proposed plan. Said amount of stock, however, in no case to be of a par value less than my total indebtedness to said bank, nor shall the whole exceed the total indebtedness of William M. Singerly, as passed and approved by said counsel.

The assignee is to be clothed with the fullest powers to join in all sales or assignments of said stock, and to participate in any scheme or reorganization and sale of said stock, taking in return shares of stock in any new company, or whatever else may be deemed advisable and proper. He is to have the rights of an owner, so far as regards sale, disposition, and management of said shares thus transferred to him.

And I do hereby constitute and appoint George H. Earle, Jr., receiver, etc., his assigns, successors, and substitutes, my attorney and attorneys, with full power to receive in his or their names or name certificates for the said shares; hereby obliging myself at his or their request to do all necessary actions or things for the same, effectually transferring the said shares and bonds to him or them.

Witness my hand and seal this tenth day of February, A. D. 1898.
[Signed]                                        William M. Singerly. [Seal.]
Witness: [Signed] S. W. Reeves.
Acknowledged before me as a notary public for the commonwealth of Pennsylvania, this tenth day of February, A. D. 1898.
[Signed]                                        S. W. Reeves, Notary Public.

The validity of this document is assailed upon several grounds. It is said to be, in effect, an assignment for the benefit of creditors, which became invalid because not recorded; that its execution and delivery constituted a fraud upon creditors; that it was procured by constructive fraud; and that Singerly was of unsound mind when he executed it. These points will be severally considered in the order in which they have been stated.

The law of Pennsylvania provides that:

"All assignments in trust by debtors on account of inability at the time to pay their debts, to prefer one or more creditors, shall be held and construed to enure to the benefit of all creditors in proportion to their respective demands" (P. L. 1843, p. 273); and that "All assignments as aforesaid to be made and executed, which shall not be recorded in the office for recording

deeds, and within thirty days, shall be null and void against any creditor of said assignor" (P. L. 1817–18, p. 287).

Was the transfer of February 10, 1898, an assignment in trust? We are of opinion that it was not. We cannot adopt the suggestion that the words "receiver of the Chestnut Street National Bank," as they occur in its first paragraph, are simply words of description. We think it is manifest that they were not so intended. The sole purpose of the transfer, as expressly stated, was to secure an indebtedness to the bank; and it seems to be clear that for this reason it was made to Mr. Earle in his capacity as receiver, and not otherwise. Consequently he took for the bank, and as the bank. He stood in the place of the bank. As its receiver, he unquestionably was a trustee for it and its creditors. But the assignment itself imposed no trust whatever. It therefore does not purport to be an assignment in trust, and we have not been convinced that it must be so regarded merely because the law of the United States required that it should be made to the receiver of the bank, instead of to the bank itself. If it had been solvent, and such an assignment had been made directly to it, it certainly would have been entitled to hold for its own exclusive benefit; and surely this right was not forfeited by its insolvency, and the consequent appointment of a receiver, to whom, subject to the direction of the comptroller, there passed the power, theretofore vested in its directors, to secure and collect its credits and other assets. We have examined the several Pennsylvania decisions to which our attention has been directed, but it is unnecessary to discuss them. They determine, at least, that an assignment by a debtor directly to his creditor is not within the statutory provisions relied on by the appellant; and, in our opinion, the transfer now in question was, in substance and legal contemplation, a transfer to the creditor bank itself. Rev. St. § 5234; Kennedy v. Gibson, 8 Wall. 506, 19 L. Ed. 476; First Nat. Bank v. Pahquioque Nat. Bank, 14 Wall. 383, 20 L. Ed. 840; Price v. Abbott (C. C.) 17 Fed. 506.

The contention that it was intended to hinder, delay, and defraud the other creditors of Singerly is not supported by anything that appears on its face, nor by the extrinsic evidence. When a debt is actually due, a fraudulent intent cannot be inferred from the mere fact of transfer (Werner v. Zierfuss, 162 Pa. 360, 29 Atl. 737); and this instrument, though undoubtedly preferential, displays no badge of fraud. It reserves nothing to Singerly, and its provision for the relinquishment of the property transferred, in case the plan of reorganization to which it refers should be drafted and put in force, was not opposed, but favorable to the interests of his other creditors. It may safely be assumed that Mr. Earle was aware that the effect of the transaction would be to postpone them, but this is immaterial. "The criterion is not the effect, but this fraudulent intent" (Werner v. Zierfuss, supra); and, as respects the existence of such intent, our independent examination of the evidence has brought us to the same conclusion as was reached by the master and by the court below. It was not shown that the transfer to the receiver was either made or taken to hinder, delay, or defraud other creditors, but simply, as it

declares, for the indisputably lawful purpose of securing Singerly's indebtedness to the bank.

Courts of equity, when exercising jurisdiction over the dealings of persons standing in fiduciary relation, will not permit the one in whom, by reason of such relation, confidence is reposed, to retain an advantage obtained at the expense of the confiding party, by exertion of the influence which naturally grows out of that confidence. This salutary rule has been frequently enforced both in England and in this country, but the facts of the present case do not call for its application. Mr. Earle, it is true, was prominently and actively concerned in an attempt to bring about an adjustment of Singerly's affairs, and a reorganization of the associations and interests which their entanglement involved. He was, too, a receiver of one of those associations, and one of the assignees of another of them; but in no sense was he a trustee for Singerly. The latter entertained the hope that the "plan of reorganization" which was suggested by Earle and Cook would inure to his benefit, and he freely co-operated with them in their earnest but unsuccessful efforts to consummate it. We have, however, searched this record in vain to find any evidence which would have justified a finding that with respect to this plan, or anything else, Earle's connection with Singerly was a fiduciary one. Moreover, any confidence which, notwithstanding the nonexistence of such relation, Singerly may have reposed in Earle, does not appear to have been abused. It was the desire of both of them that this transfer to the receiver of the bank, as well as that which was made to Earle and Cook as assignees of the trust company, should be made; but that any undue influence was exercised to procure them does not appear. They were executed and delivered upon the advice of Singerly's separate counsel, and the fact that this advice was based "mainly, if not altogether, upon the ground that their execution was desired by Earle," is not material. Whatever may have been Singerly's motive for making them, or the prevailing consideration in the mind of his counsel when advising them, no advantage seems to have been taken of Singerly; nor does Earle's position, such as it was, appear to have been in any way used either to coerce or allure him.

We have attentively examined the voluminous testimony which was adduced upon the question raised as to the sanity of Mr. Singerly. It could not be reviewed at length without unduly expanding this opinion, or be better summarized than it already has been in the report of the master. We concur with him, and with the learned judge of the court below, in holding that, as a whole, it did not establish that Singerly was insane when he executed the transfer to Earle. Whatever room there might be for controversy upon any more general aspect of the subject, there can, we think, be no reasonable doubt as to the capacity of Singerly to rationally contract as and when he did contract; and the existence or nonexistence of such capacity at that time was and is, of course, the precise question for determination. Upon that question we approve and adopt the findings, reasoning, and conclusion of the master, and, without restating them at length, deem it enough for the present purpose to say that we are

entirely satisfied of the correctness of the following statements which we extract from his report:

"In this case the testimony clearly establishes that the matter of these preferential assignments was, prior to their execution, the deliberate, conscious, and voluntary action of Mr. Singerly; that he gave the necessary instructions for their preparation, and that their substance and import was explained to him by his own counsel, who then believed, and does not now question, in his testimony, that Mr. Singerly fully understood the nature of his act; and that Mr. Singerly, after the execution of the assignments, was conscious of what he had done, and at no time repudiated his solemn act during his lifetime. * * * Of those who were present, all testified, except Mr. Addicks and Mr. Singerly, both deceased; and all of them, including Mr. Singerly's counsel and the present counsel for the respondent, agree that his mental responsibility and sober condition was never questioned by them."

The administrator of Singerly's estate had no just ground for complaint of the exchange which was made of Record stock and bonds for Traction stock, as collateral to the notes of Singerly which were originally held by the Pennsylvania Company for Insurances on Lives and Granting Annuities, and were purchased from it by the Finance Company of Pennsylvania, the Guarantee Trust & Safe Deposit Company, and the Pennsylvania Warehousing & Safe Deposit Company. The Traction stock had been borrowed by Singerly to be used by him to secure the loan which he afterwards obtained upon those notes, and it was so used. To protect its owners, Singerly transferred to a trustee for them the shares and bonds of the Record Company. After Singerly's failure and death, it became evident that the Traction stock was liable to sale by the pledgee thereof, and that, upon such sale being made, the trustee who held the Record shares and bonds might and would sell them to liquidate the loss of the owners of the Traction stock. The situation was a serious and menacing one for Singerly's estate, as well as for the bank's receiver. A sacrifice of valuable assets was imminent, and this Mr. Earle was anxious to avoid. Accordingly, and with the approval of the comptroller of the currency, he procured the surrender of the Traction stock to its owners, and the acceptance in its place of the stock and bonds of the Record Company. By this arrangement no harm was done to the estate of Singerly. Manifestly, it was to its advantage. It prevented a forced sale of the Record stock and bonds, and extinguished the obligation which Singerly had assumed to those who had loaned him the Traction stock; and this it accomplished without imposing any lien or charge upon the Record stock and bonds to which they were not already, in substance, subject. It was not only a fair and honest transaction, it was an eminently discreet and proper one. It was one to which the assent of the appellant, if requisite, might reasonably have been expected. It is insisted, however, that, because he did not in fact assent to it, he is entitled to take these stocks and bonds free and discharged of and from any lien whatever. In assuming this position, he, no doubt, has been actuated by a sense of duty to the interests he represents, but to us the demand itself seems to be too plainly inequitable for possible allowance in a court of conscience. Even, however, if the assent of the representative of Singerly's general estate to the arrangement in question might otherwise have

been necessary, it was, we think, rendered unnecessary by the assignment of February 10, 1898; for by it Mr. Earle was "clothed with the fullest powers to join in all sales or assignments of said stock," was vested with "the rights of an owner, so far as regards sale, disposition and management" thereof, and was empowered to demand further assurances for "effectually transferring the said shares and bonds to him." Consequently he was, in our opinion, amply authorized to deal with them as he did, and no action on the part of the administrator was needful.

Having, we believe, sufficiently stated our views upon all the points presented for our consideration by the learned counsel of the appellant, it remains but to say, as to the whole case, that the decree under review is, in our judgment, in no respect erroneous. It is therefore affirmed, and the cause will be remanded to the circuit court for such further proceedings as may be requisite or proper to be there taken in pursuance thereof or in conformity therewith.