<hr/>

### BATES v. DRESSER et al.

(District Court, D. Massachusetts. December 17, 1915.)

No. 227.

1. COURTS ⬤294—JURISDICTION OF FEDERAL COURTS—SUIT BY RECEIVER OF NATIONAL BANK.

The fact that a suit is brought by the receiver of a national bank in the course of winding up its affairs gives a federal District Court jurisdiction, under Judicial Code (Act March 3, 1911, c. 231) § 24, par. 16, 36 Stat. 1092 (Comp. St. 1913, § 991), regardless of the citizenship of the parties.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 836; Dec. Dig. ⬤294.]

2. EQUITY ⬤409—REFERENCE TO MASTER BY CONSENT—REVIEW OF FINDINGS OF MASTER.

Under a consent order, referring a case to a master to hear, and to report to the court his findings of fact and rulings of law thereon, which further provides that any party "shall have the right to a review and a determination by the court upon the evidence reported by the master," and that the master "shall report to the court all the evidence bearing upon any question of fact which any party desires to be re-examined and found by the court," the findings of fact by the master are no more than presumptively correct, but will be sustained. except as they appear to the court to be clearly against the weight of evidence, or so inconsistent with each other that they cannot properly stand.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 904, 920–923; Dec. Dig. ⬤409.]

3. BANKS AND BANKING ⬤253—INSOLVENCY—LIABILITY OF DIRECTORS.

The by-laws of a national bank provided that every six months, which was supposed to be immediately preceding the declaring of the semiannual dividend, there should be appointed by the board of directors "a committee whose duty it shall be to examine into the affairs of the bank, to count its cash and compare its assets and liabilities with the balance on the general ledger, for the purpose of ascertaining whether or not the books are correctly kept and the condition of the bank in a sound and solvent condition." The deposits averaged between $300,000 and $400,000. During the three years and three months preceding its closing, the bookkeeper who kept the deposit ledger was stealing from the bank in increasing amounts, which aggregated $310,000. His method was the drawing of checks on the bank, which were cashed in a city and returned with other checks through the clearing house. He received the checks, withdrew his own, and charged the sum to other deposit accounts, until the amount grew too large to be covered in that way, and then made false entries and footings, which an examination of his ledger would have readily detected. During the time the directors made but two examinations, and on neither occasion did the committee examine the deposit ledger, nor compare the checks received through the clearing house with the lists which accompanied the same, from which the remittances were made. There were also other circumstances which should have put them on inquiry. *Held*, that the directors were negligent in failing to make examinations at proper times and in proper manner, and were liable for the

<hr/>

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

losses of the bank through the thefts after the time when a proper examination would have disclosed the same.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 944–949; Dec. Dig. ☞253.]

4. ABATEMENT AND REVIVAL ☞53—CAUSES OF ACTION WHICH SURVIVE—ACTION BY BANK RECEIVER AGAINST DIRECTORS.

An action by the receiver of an insolvent national bank against its directors, to recover for losses sustained through their misconduct or negligence for the benefit of creditors and stockholders, is ex contractu, and survives the death of a defendant.

[Ed. Note.—For other cases, see Abatement and Revival, Cent. Dig. §§ 251, 252; Dec. Dig. ☞53.]

In Equity. Suit by John L. Bates, receiver of the National City Bank of Cambridge, Mass., against Edwin Dresser and others. Decree for complainant.

Bates, Nay & Abbott, of Boston, Mass., for plaintiff.

Clarence A. Bunker, of Boston, Mass., specially for Geo. E. Richardson.

A. E. Pillsbury, of Boston, Mass., specially for David A. Barber.

Tyler & Young, of Boston, Mass., for defendant Geo. E. Richardson.

Robert M. Morse and Alger, Dean & Sullivan, all of Boston, Mass., for defendants, Edwin Dresser, Sumner Dresser, and Geo. W. Gale.

BINGHAM, Circuit Judge. This is a bill in equity, brought by the plaintiff, as receiver of the National City Bank of Cambridge, Mass., against the defendants, to recover the losses which the bank sustained through the defalcations of George W. Coleman, its bookkeeper, which took place during a period extending from November 24, 1906, to the close of the bank, February 21, 1910.

The plaintiff's claim of a right to recover is based upon the ground that the defendants, as president and directors of the bank, were bound to use due care and diligence in the management and supervision of its affairs, and that, through their negligence in this respect, they failed to discover Coleman's misconduct in season to prevent the whole or any part of the losses which the bank sustained during the three years and three months that Coleman's peculations were going on.

[1] As there is no diversity of citizenship, and the ground of action is for a breach of their duties as directors at common law and in equity, federal jurisdiction depends upon the fact that the proceeding is brought by a receiver of a national bank in the course of winding up its affairs and is sanctioned by section 24, paragraph 16, of the Judicial Code of 1911. International Trust Co. v. Weeks (C. C.) 116 Fed. 898, 899; Weeks v. International Trust Co., 125 Fed. 370, 373, 60 C. C. A. 236; International Trust Co. v. Weeks, 203 U. S. 364, 27 Sup. Ct. 69, 51 L. Ed. 224; Auten v. United States National Bank, 174 U. S. 125, 141, 19 Sup. Ct. 628, 43 L. Ed. 920; Guarantee Co. v. Hanway, 104 Fed. 369, 44 C. C. A. 312; McCartney v. Earle, 115 Fed. 462, 53 C. C. A. 392. The question decided in the recent case

of Herrmann v. Edwards, 238 U. S. 107, 112, 35 Sup. Ct. 839, 59 L. Ed. 1224, differs from the one under consideration, as that suit was not brought by a receiver in the course of winding up the affairs of a national bank, and jurisdiction, if it existed, was held to depend upon diversity of citizenship or the presence of a federal question.

[2] On October 16, 1911, pursuant to an agreement of the parties, and under an order of the court, the case was sent to a special master, with directions "to hear the parties and report to the court his findings of fact and rulings of law thereon." The order also contained the following provision:

"Any party to the suit shall have the right to a review and a determination by the court upon the evidence reported by the master. The master shall report to the court all the evidence bearing upon any question of fact which any party desires to be re-examined and found by the court, and such other portions of the evidence as may be material to any requests for rulings or other question of law which any party may desire to present to the court."

The case has been heard by the master, and he has filed a report covering 94 typewritten pages, together with a book containing 597 pages of special findings, in addition to the general and special findings contained in his report, and he has made the figures of the expert showing the state of the depositors' ledger during the time the defalcations were taking place a part of the report. He has also reported all the evidence and exhibits in the case. He adopted this course, for the reason that there was no other practical way of complying with the court's order, in view of the great number of exceptions taken to facts which he found and refused to find, as the labor of separating out the evidence bearing on each particular question would be too great.

After finding many preliminary facts and stating much of the evidence bearing upon the conduct of the defendants, as president and directors, in the management and supervision of the bank, the master reached the conclusion that none of the defendants was negligent.

The plaintiff has excepted to the general finding and ruling of the master that the defendants were not negligent, as inconsistent with his other findings of fact, and as directly against the weight of the evidence. He has also excepted to the finding and ruling that the defendant Edwin Dresser was not guilty of actionable negligence, as inconsistent and wholly at variance with the master's special findings of fact, stating in detail wherein it is claimed to be inconsistent, and as against the weight of the evidence; and he has taken numerous other exceptions to special findings of fact and rulings of law.

At the hearing before me on the master's report, counsel for the defendants took the position (1) that the findings of fact made by the master were conclusive, or (2) that, if not conclusive, they were presumptively correct, and that the reservation of the right of review contained in the order of the court was not so broad as to render the master's findings advisory only. In support of the first proposition they rely on the case of Davis v. Schwartz, 155 U. S. 631, 15 Sup. Ct. 237, 39 L. Ed. 289. That case does not seem to me to be in point, for the reason that there the order sending the case to the master con-

tained no reservation of a right of review. On the second proposition reliance is placed on the decision in Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764. There the order sending the case to the master, as in this case, was by consent of the parties and directed the master "to hear the evidence and decide all the issues between the parties and make his report * * * separately stating his findings of law and fact, together with all the evidence introduced before him, which evidence thereby shall become a part of the report, which report shall be subject to like exceptions as other reports of masters"; and it was held that the findings of the master should be "treated as so far correct and binding as not to be disturbed unless clearly in conflict with the weight of the evidence upon which they were made." In the recent case of Goldsmith Silver Co. v. Savage, 229 Fed. 623, —— C. C. A. ——, decided by the Court of Appeals for this Circuit December 10, 1915, the decision in Kimberly v. Arms was followed; the reservation of the right of review in the two cases being made in substantially the same language. In the present case it would seem that the parties and the court must have understood, from the language employed in the order, that findings of fact made by the master, which the parties did not ask to have re-examined by the court, should be regarded as conclusive; but the language, reserving the right of review as to findings which they did desire the court to re-examine, is so broad it would seem that the decision in Kimberly v. Arms must have been in the mind of the draftsman, and that he was seeking to provide for a more extended right of review than was held to be reserved in that case. For instance, the order directs the master to report all the evidence bearing on any question of fact which either party desired to have re-examined and found by the court, and provides that any party to the suit shall have the right to a review and a determination by the court upon the evidence reported by the master of any finding of fact or conclusion of law made by the master. But, however this may be, in the consideration of the case I shall regard the findings of the master as presumptively correct and to be sustained, except in so far as I regard them as clearly against the weight of the evidence, or it appears that his findings, general or special, are so inconsistent with one another that they cannot properly stand.

[3] The National City Bank of Cambridge was organized in 1867. At the time of the defalcations Edwin Dresser was, and for many years prior thereto had been, the president and a director of the bank. He was also one of the largest stockholders and depositors. His account was an inactive one, and ran from $35,000 to $50,000. The defendants Gale and Sumner Dresser were directors for many years prior to Coleman's employment, and were such during the period covered by his defalcations. The defendants Barber and Richardson became directors in January, 1907, and remained in office to the close of the bank. July 30, 1903, Mr. Earl was chosen to succeed one Davis as cashier. Mr. Davis had been a director, and continued as director for a time after he ceased to be cashier. From the fall of 1903 to the spring of 1904 Albert B. Roaf acted as teller; from the spring

of 1904 to February, 1905, Charles L. Bragg was teller; and from February, 1905, until October, 1905, Lewis W. Cutting was teller; from October, 1905, to November, 1907, Coleman acted as teller and bookkeeper; and from November, 1907, to the close of the bank Edward A. Paul was teller.

Coleman first came into the bank in July, 1903. He was then 17 years of age and was employed as messenger. He continued as messenger up to January 1, 1904, when he was made bookkeeper, which position he held from that time to the close of the bank, doing also the work of teller from October, 1905, to November, 1907, as above stated. Prior to entering the bank he had taken a course in Burdett's Business College and had graduated there. He received for his services, first $4 a week, then $8, $10, and later $12, the last sum being the highest compensation he received at any time.

After January, 1904, when Coleman became bookkeeper, one Lockhart was messenger, and continued in that position until August, 1907. After that time two other men served as messengers. Lockhart was not regularly employed by the bank thereafter, but in the summers of 1908 and 1909 he kept the depositors' ledger while Coleman was away on a vacation. In May, 1909, he entered the employ of Coleman at $15 a week and continued in his employ until the bank failed.

Edwin Dresser did not give all of his time to the affairs of the bank, as he was engaged in other business enterprises. He conducted the business known as the Standard Diary Company, of which he was president; he was a trustee of the Cambridge Savings Bank, and at one time its vice president, and frequently settled estates of deceased persons. It was his custom to be at the bank every morning at 8:30 and remain for an hour or two, to consider with the cashier questions pertaining to the discounting or purchasing of paper or other securities for investment, and to return again in the afternoon for an hour or so to ascertain how things had gone on during the day. The time he gave to the bank was devoted largely to the matter of making investments. He at times signed checks to pay the demands of the Clearing House and First National Bank, and looked after such matters as requiring tellers to make good shortages in their cash, and discharged them when he regarded them as incompetent or unduly careless in handling their cash.

In the general routine of the business, the teller received all deposits and paid all checks at the counter. It was his duty, when deposits were made, to enter the amount of them on a slip of paper and put the deposit slip of each depositor on a spindle. When he paid checks, he also made entries of the payments on the slip of paper and put the checks upon another spindle. The entries made by the teller were not intended as permanent records, but to assist him at the close of the day's business in settling his cash. During the day the bookkeeper would take the deposit slips and checks, credit the deposits and charge the checks to the accounts of the individual depositors, and two or three days a week he would extend the balance due each depositor at the end of those days to the balance column, as hereafter explained. As the bookkeeper finished his work with the checks and deposit slips,

the cashier would take them and enter the amount of each check and deposit in the check and deposit columns of the cashier's ledger, but without entering the name of the drawer of the check or of the person making the deposit. All checks and deposits received by the teller at the counter were entered in the depositor's ledger in black ink. The Cambridge banks exchanged checks each day with the National City Bank. Checks thus received were treated as counter checks and were entered in the depositors' ledger in black ink. Checks coming from Boston were charged in the depositors' accounts in red ink.

In case a check drawn on the National City Bank found its way into a Boston bank other than the National Shawmut or the First National, it was sent through the Boston Clearing House for collection. Accompanying the check or checks drawn on the National City Bank and sent to the Clearing House by such a bank would be a slip showing the amount of the checks in detail and the total. In case a number of Boston banks had deposited with them checks on the National City Bank, each would send the checks to the Clearing House accompanied by a slip made out as above stated. The Clearing House would, at the end of each day, make out what is designated as the large Clearing House slip, on which was typewritten the totals of the checks shown on each slip of the different banks, added so as to show the total of all of them, but without designating the banks from which the checks came; the small slips showing that. The Clearing House slip, with the small slips and the checks, would be placed in an envelope and mailed to the National City Bank at the close of the day's business, and would be received at Cambridge the next morning.

The envelope containing these checks was generally taken from the post office by the messenger, although Coleman sometimes, after he ceased being messenger, procured it at the post office and carried it to the bank. At the bank Coleman would open the envelope and verify the checks with the amounts on the small slips from each bank, compare their totals with the sums entered on the Clearing House slip, and then charge the checks to the individual accounts of the depositors, provided the checks were properly drawn on the National City Bank and properly indorsed. If any check coming from the Clearing House was not properly filled out, indorsed, or was otherwise imperfect, it would be charged back by deducting the amount of such check from the total shown on the large Clearing House slip and returning it, and the same would be done in case the drawer of the check had no funds to meet it. The large Clearing House slip would, during the day, be taken by the cashier, who would deduct such checks as were to be returned from the total amount shown on the Clearing House slip, and send to the Clearing House a draft for the balance due it, drawn on the National Shawmut Bank of Boston, where it had a deposit, together with the rejected checks.

The First National and the National Shawmut banks did not send checks drawn on the National City Bank through the Clearing House, but each sent them through the mail to the National City Bank with slips on which the checks from each bank were minuted. The envelopes containing these checks and slips, on being received through

the mail, would be turned over to Coleman, who would go over them and dispose of them in the same way he did the slips received from the Clearing House.

All checks received from the Clearing House and the Boston banks were charged into the depositors' accounts in red ink.

The cashier, during the day, would take the slips showing the checks sent by the First National and Shawmut banks from the table where they were left by the bookkeeper, transfer from each of these slips the totals as shown thereon to the Clearing House slip in his own handwriting, and enter the total of the three slips in one item in the check column of the cashier's ledger. At the end of the day the checks, the large Clearing House slip, and the small slips of the various Boston banks, including the Shawmut and the First National, were gathered up and put in the safe.

As the National City Bank kept a deposit with the National Shawmut Bank, the checks received from the Shawmut were credited up to the Shawmut account; but the sums due the Clearing House and the First National Bank were paid by drafts on the Shawmut. These drafts were ordinarily signed by Earl, the cashier, but were occasionally signed by Edwin Dresser, the president.

The checks were retained by the bank until the end of the month, when the depositors' passbooks were balanced by Coleman and the messenger, and the checks were then returned to the various depositors who had drawn them. The Clearing House slip and the smaller slips of the Boston banks were retained by the bank.

The depositors' ledger, kept by the bookkeeper, was made up in folios. In 1903 and 1904 each folio comprised 10 pages; in 1905, 1906, and 1907, 12 pages; and in 1908, 1909, and 1910, 14 pages. About the middle of each page was printed the names of depositors, 45 to a page, arranged in alphabetical order from the top to the foot of the page. During the time when the folio had 14 pages, page 1 of the folio began with Wednesday and ended with the following Tuesday. The balances, however, of Tuesday of the previous week would be brought forward and appear in the second column, marked "Tuesday's Balance" on each page of the folio. Under the heading "Wednesday" would appear a column headed "Checks in Detail," then to the right and next to it a column headed "Total Checks," then to the right and next to it a column headed "Deposits," and then to the right of that a column headed "Balance." The subdivisions under the heading "Thursday," "Friday," "Saturday," "Monday," and "Tuesday" were the same, except that under "Tuesday" the balance column would be found on the corresponding page of the succeeding folio. Each of the 14 pages was made up in this way. The pages were numbered consecutively from 1 to 14; each page having on it the names of different depositors against which their accounts were entered. Checks drawn against a customer's account and paid by the bank were charged to that account, on the day they were paid, in the "Checks in Detail" column; the amounts being placed one above the other. In the "Total Checks" column was placed the sum of the checks in the "Checks in Detail" column. In the "Deposits" column deposits for

the day were placed, and in the "Balance" column the sum due the depositor at the close of the day. This sum was ascertained on Wednesday by subtracting the difference between the checks paid and the deposits made on that day from, or adding it to, the previous Tuesday's balance due the particular depositor; the addition or subtraction depending upon whether the deposits made were greater or less than the checks paid for him on that day. The additions at the foot of the "Total Checks" and "Deposits" columns would show the amount of business transacted with the depositors named on a particular page for that day, and the balance due the depositors on that page for that day could be ascertained, either by adding the balance column, or by extending the footing by computation. The sum of the footings of the balance columns on all the pages for a given day would represent the total deposits in the bank at the close of business for that day. Provision was made on the fourteenth page of each folio for carrying over the footings of the "Total Checks" column, of the "Deposits" column, and of the "Balance" column on each page for every day on the page, and, if this was done at the close of each day's business, and these transferred balance footings were added, one could ascertain at a glance, by referring to the fourteenth page, what the balance of deposits in the bank was on any day during the week covered by the folio.

In the master's report it is said that, in examining an individual depositor's account on the deposit ledger, "it had to be read across the page." This would give the impression that to ascertain the state of a depositor's account on a particular day one had to read and compute the figures extending across the entire page; but the fact is that it would be necessary to look only at the "Total Checks" column and the "Deposits" column, which were right beside each other, and at the previous day's "Balance" column, to see whether the balance credited to the depositor for that day was correct; and the sums deposited and the checks withdrawn by a given depositor on any particular day were, as a rule, so few as to render the task of verifying the account for that day a very simple one.

The "Total Checks" column and the "Deposits" column should be footed each day. It was not the practice in the bank to carry forward the individual balances every day, but this was done twice or three times a week. When the balances were carried forward, the "Balance" columns should be footed, and when not carried forward the balance footing on each page for that day should be extended, and the footings to the "Total Checks," "Deposits," and "Balance" columns on the several pages for the day should be transferred to page 14, and the balance due depositors struck, so that it could be ascertained, by simply referring to that page, what the balance on a given day was.

The cashier's ledger, in addition to showing the daily deposits and daily withdrawals, as heretofore set forth, showed its accounts with the National Shawmut Bank and its New York correspondents; also the total sum due depositors on a given day. There was also a column in which the resources and liabilities of the bank were set out in

detail. This book was always kept by the cashier. If the depositors' ledger and the cashier's ledger were correctly kept, the balances due depositors, as shown on the two books, would be the same.

Mr. Earl, during the period covered by Coleman's stealings, rarely, if ever, examined the checks coming through the mail from the Boston banks and the Clearing House. He invariably saw the checks and deposit slips that came in over the counter and entered the amount of each in the ledger which he kept. The sum entered in his book in the check column and marked "C. H." was the total, as made up by him, of the demands due the Clearing House, the First National Bank, and the National Shawmut Bank.

The teller had nothing to do with the checks coming from the Clearing House, the First National, and the Shawmut banks, and at the end of each day, when he checked up with the cashier, the checking related only to such transactions as he and the cashier had had to do with on that day, and its primary purpose was to see that his cash balance was correct. It had no relation to the withdrawals by Boston banks and the Clearing House.

In May, 1906, when Coleman was paying teller and bookkeeper, he entered the bank one night and took from its vault $2,000. After having parted with this sum, he became frightened, and procured the amount from his father, and restored it to the bank the next day. This was not known by the directors. The first stealings of his, that were found upon the books of the bank, occurred November 24, 1906. He was, at this time, acting as teller and bookkeeper. Whether the sums taken while he was both teller and bookkeeper were all cash, and were wrongly charged up on the depositors' ledger, or the defalcations were brought about by having some one draw checks on the bank in his interest, which he wrongly charged up on the depositors' ledger, the evidence does not disclose. He may have adopted both methods; but, inasmuch as at that time he was both paying teller and bookkeeper, and, as paying teller, had the handling of the cash, it is far more probable that, as a rule, he took the cash, rather than that he resorted to the check method of getting the money out of the bank.

His stealings in 1906, not including the money restored, amounted to $1,005. About the time he commenced to steal he began to speculate in stocks through brokers in Boston and kept accounts with them. In fact, he continued to speculate in stocks down to February 7, 1910, when his last stock speculation took place.

Coleman kept a small deposit in the National City Bank, and would draw checks upon the bank payable to his broker's order for sums far in excess of his deposit, and either present them in person to his broker or send them by his messenger. These checks would be taken by the broker, who would give Coleman or his messenger his own check for an amount equal to Coleman's check or checks drawn on a bank in Boston. Then Coleman or his messenger would at once present the broker's check at the Boston bank and obtain the cash. All of his transactions were not conducted through the same broker; the evidence shows that he dealt largely with one J. Thomas Reinhardt. The same methods, however, were pursued with all the brokers. The checks

which Reinhardt gave to Coleman or his messenger in exchange for Coleman's checks on the National City Bank were always drawn on the National Union Bank of Boston; Coleman's checks were always deposited by Reinhardt in the National Union Bank, and would go from that bank to the Clearing House, and would reach the National City Bank the morning of the next day in the Clearing House envelope. Coleman, who opened the envelope, would verify the checks, and enter all of them upon the depositors' ledger except his own, which he would take out and suppress. As Earl rarely, if ever, looked over the Clearing House checks, he did not discover Coleman's method of stealing. The amount of Coleman's check, however, was stated on the National Union Bank's slip, which went with the Clearing House slip and was included in the total for which the cashier drew his check on the National Shawmut Bank to pay the Clearing House demand. The master finds that Coleman conceived and actually put in operation this method of stealing before he ceased to be teller in November, 1907. His stealings at the end of December, 1907, amounted to $32,100.

Coleman resorted to various methods to conceal his thefts on the books. During the period when he expected a national bank examiner, it was his custom to charge the amount taken to some large account or accounts. At other times he would conceal his defalcations, or some of them, by false and excessive additions of his "Total Checks" columns, and in this way apparently increased the withdrawals. Then, again, he would conceal them by making false footings of the "Balance" columns on days when individual balances had been carried forward to those columns, and by extending false footings for those columns when the individual balances had not been carried forward; the addition or extension being less than the true balance, so that when the total of all the balance footings was made up at the end of the day's business the amount shown on the depositors' ledger was less than the sum actually due depositors. He also concealed his defalcations by dropping the balances of individual depositors without entering any checks to justify the drops. But his favorite methods seem to have been either not to extend the balances of the individual accounts to the "Balance" columns, so these columns could not be added, or, if the individual balances were extended, to make false footings to the columns, or not to extend the footings of the balance columns when individual balances were not extended, or, if he did, to extend a false footing less than the real one.

An examination of the depositors' ledger during the period covered by his stealings will disclose his defalcations concealed by any one of these methods. In the early part of 1907, when his stealings were small, his false entries were few and would not be readily discovered. At the end of February, 1907, his stealings amounted to only $2,840, and around March 14, 1907, when the master says his false footings were always made on page 4 of the depositors' ledger, his stealings were practically the same. After March 14, 1907, his stealings increased very considerably, which of necessity increased the false entries upon

his book, at which time the master finds that "false entries were made on various, and perhaps all, of the pages."

At the end of March, 1907, his stealings amounted to $11,865, and at the end of April were $17,100. This sum was increased from time to time, and at the close of December, 1907, it amounted to $32,100. During this year his defalcations were concealed by dropping the balance due Edwin Dresser anywhere from $17,000 to $20,000, by making false additions of the "Balance" columns, and by failing to transfer to page 14 of the folio the balance footings and add the same, which, if it had been done, would have disclosed that his balance footings for days and weeks exceeded the deposits on the cashier's ledger by many thousand dollars; and this was so, notwithstanding he had made the additions of some of the "Balance" columns less than the true additions.

The master has found that at the end of every day the cashier's figures and Coleman's agreed. What Coleman gave Earl as the balance due depositors on any given day may have compared with the sum due them as it appeared on Earl's ledger. Coleman had access to Earl's ledger, and could easily learn from it the sum necessary to make the comparison when called on by Earl. This would be much easier than totaling the footings of his "Deposits" and "Total Checks" columns for the 14 pages for the day and adding them together to get the totals of the respective columns and striking the balance, and it was sure to compare with Earl's figures, while a computation made from his books ordinarily would not. The agreement, therefore, between Earl's and Coleman's figures, must, as a rule, have been due to Coleman's knowledge of what Earl's book showed.

The Edwin Dresser account was not the first individual account that Coleman manipulated prior to May 1, 1907, for he had raised or lowered the individual accounts of others in a few instances. The reason why, in May, 1907, he charged up his defalcations to the Dresser account was to prepare his books so that the balances would be apparently correct when the national bank examiner arrived, who was expected about that time and actually came on June 6th. And, as a national bank examiner usually made another call the last of November or the first of December, he again, on November 4th, dropped Mr. Dresser's balance $20,000; his stealings at that time being in the vicinity of $30,100. The remainder of his defalcations at this time he concealed by dropping the balances of other depositors. In the period intervening between the visits of the bank examiners he carried his defalcations more or less of the time in false footings, but did not confine himself to any particular method. The master finds that:

· "Whenever the bank examiners were due, he would mass the defalcations into a few accounts, carrying forward reduced balances, but making all other entries correctly, so that an addition of his different columns would be correct."

This is not strictly correct, for in December, 1908, and June and December, 1909, when the bank examiners came, as hereinafter pointed out, an addition of the balance columns would show the footings were wrong.

Coleman's stealings during the year 1908 amounted to $17,571, which added to previous sums taken, made the total at the end of the year $49,671. From the 1st of January, 1908, to the 21st of April of that year, an addition of the footings of his daily balance columns corresponds with the deposits on the cashier's ledger, but a correct addition of the balance columns on his ledger from day to day would show that throughout that entire period the amount due depositors exceeded the sum due them as it appeared on the cashier's ledger anywhere from a few dollars to $28,000. From April 21, 1908, to June 22, 1908, the additions of his balance columns were correct, and these totals, if added, would correspond with the cashier's ledger, but, beginning with June 22d and continuing down to July 14th, while an addition of the footings of his balance columns would correspond with the cashier's ledger, a correct addition of his balance columns would not correspond with his footings or with the cashier's ledger by amounts varying from $900 to $25,400. From July 14, 1908, to November 10th, an addition of the footings of his balance columns would show that the sum due depositors each day exceeded the amount appearing on the cashier's ledger by sums varying from about $21,000 to $46,310, and during a greater portion of this time a correct addition of the balance columns would exceed his footings of those columns. On November 10, 1908, he began to prepare for the bank examiner, and after that date, down to November 30th, the footings of his balance columns were correct and an addition of them would correspond with the sum due depositors on the cashier's ledger. From November 30, 1908, to the end of the year his balance footings, if added, would correspond with the cashier's ledger substantially all of the time; but a correct addition of his balance columns would exceed the amount due depositors on the cashier's ledger by sums varying from $2,000 to $14,741.75. From January 5, 1909, to March 30th, an addition of his balance footings for any day would exceed the sum due on the cashier's ledger by many thousand dollars, and a correct addition of the balance columns would for each day exceed the sum due on the cashier's ledger from about $13,000 to over $36,000. From March 30 to July 7, 1909, an addition of the balance footings would compare with the cashier's ledger each day, with the exception of four days in the last of May and on the 10th of June; but a correct addition of his balance columns would not have corresponded with these footings, except on June 7th and 8th. On June 14th, the day before the bank examiner came, a correct addition of the balance columns for that day would have shown that the sum due depositors exceeded the sum shown on the cashier's ledger by $1,050.04, and a correct addition of the balance columns for the 15th, the day he came to examine the bank, would have been larger by $3,065.12.

It would seem that at the time of this examination the bank examiner could not have added the balance columns at all, for, if he had, he would not have found them correct. A correct addition of the balance columns for every day from June 14, 1909, to the close of the bank would show a sum due depositors exceeding the sum due them on the cashier's ledger anywhere from $1,000 to $274,777.83, and after July

8th ranging from $77,375 to the larger sum. Moreover, it appears that from July 8th to the close of the bank there was never a time when an addition of the footings of the balance columns for any one day would have corresponded with the amount due depositors on the cashier's ledger, except November 30 and December 2, 1909, and that from Wednesday, December 8, 1909, on, the balance columns were never added, and no balance footings were extended. All that Coleman did during this period was to add up the total checks and deposits columns from day to day—never a balance column.

The bank examiner who examined the bank November 30, 1908, testified that his examination of the depositors' ledger was for November 28, 1908. The balances of the individual depositors were not extended to the balance columns for that day, but footings for the balance columns were extended, and the evidence discloses that all the examiner did was to add the extended footings. This being so, he could not have ascertained by an addition of the balance columns whether they compared with the cashier's ledger or not. All he could tell from what he did was whether the addition of the footings corresponded. To have ascertained what the balance was on that day he would have had to extend the individual balances of each depositor from the preceding Tuesday, add the balances thus extended, and add the footings thus ascertained, which, it is apparent, he did not do. On December 3, 1909, the same bank examiner examined the bank and made a comparison of the depositors' ledger with the cashier's ledger for December 2, 1909. On December 2d the balances due individual depositors had been extended to the balance column, so that they could be added. The footings for those columns, if added, would have equaled the balance due depositors on the cashier's ledger. It is evident, however, that the examiner at this time, in making his examinations of the depositors' ledger for comparison, did not go beyond adding the footings of the balance columns; that he did not add the columns, for, if he had, he would have found the footings were wrong. In the Thursday's balance column—December 2, 1909—the extended balance in the account of Edwin Dresser was $39,068.31. Although the column contains numerous other items, the total of which would be many thousand dollars, the footing for that column is only $27,076.28. There was no erasure and raising of the balance due Edwin Dresser in this column, although it is apparent that there had been in that of the preceding Tuesday. The examiner, not only did not add the column, but failed even to glance over it, for, had he done so, he would have seen that the footing was several thousand dollars less than the one item in the column to the account of Mr. Dresser.

The first examination made by the bank examiner in 1908 was June 16th. At that time the additions of the balance columns were correct, and the total of the balance footings corresponded with the cashier's ledger. Coleman had then transferred to page 14 of the folio the footings of the "Total Checks," "Deposits," and "Balance" columns from every page for each day, and these balance footings were added up so that one could see, without making any computation,

what was due depositors on any day during the week. This, however, seems to have been the last time he completed the entries in a folio in this way. After this, for a time, he transferred to page 14 simply the footings of the "Total Checks" and "Deposits" columns; then again he would transfer only the footings of the "Balance" column for two days of the week, and then again he would not transfer anything.

After November, 1907, when Paul became teller, Coleman had nothing to do with the actual handling of the cash or securities. The depositors' ledger, which he kept after that date, had nothing to do with the resources of the bank, but was a means of determining one of its liabilities, and because of this I do not understand what the master means where he says that:

"When the figures were made up on each day, both Coleman's figures and the cashier's were correct as to the actual cash resources."

The directors were supposed to meet as a board every Monday at 9:30 a. m. Section 16 of the by-laws provided for the keeping of a minute book, "in which shall also be recorded the proceedings of the board at all regular and special sessions." Section 19 provided:

"There shall be appointed by the board, every six months, a committee whose duty it shall be to examine into the affairs of the bank, to count its cash, and compare its assets and liabilities with the balances on the general ledger, for the purpose of ascertaining whether or not the books are correctly kept, and the condition of the bank in a sound and solvent condition, the result of which examination shall be reported to the board at their next regular meeting."

In 1907, 49 directors' meetings were held. All of the directors were fairly constant in their attendance upon the meetings this year, except Richardson, who attended only 4. Mr. Barber was in Europe for a time during the year, and, while he attended a large number of meetings, his absence prevented his attending quite as many as some of the other directors. In 1908, 48 meetings were held. The attendance of all of the directors was fairly constant this year, with the exception of Mr. Richardson, who attended but one. In 1909 there were 43 meetings in all, 41 regular and 2 special meetings, and all of the directors, except Mr. Richardson, attended 39 or more of the meetings. Mr. Richardson attended but 2, these being held February 15th and March 15th. In April, 1909, Mr. Richardson met with an accident and was unable to go to business until September. The master finds that he was physically disabled until the latter part of December; but the only evidence in the case relating to the matter is that he was physically disabled up to September, and from that time on he went to his work at the New England Trust Company, although he did not take on all his labors until the beginning of December. In 1909 the directors' meetings appear to have been regularly held from January down to the 24th of May; but from the 24th of May to the 19th of July no meetings were held. Mr. Gale was in Europe and Mr. Richardson was sick. From July 19th to September the meetings were regularly held, but in September two meetings in succession were omit-

ted. At this time Mr. Edwin Dresser was disabled and Mr. Sumner Dresser was serving on a jury.

"It was the cashier's duty to present to the board of directors at their regular meetings a statement of the condition of the bank. For that purpose he had a printed slip headed 'State of the Bank.' Then followed a list of 'Resources,' which showed the loans, specie, and all other forms of cash, the deposits in other banks, stocks, etc. Then followed a statement of 'Liabilities,' which included the capital stock, surplus, profit and loss, and amount of deposits. From the slip the directors could judge whether there was money enough to make additional loans or purchase paper or securities for investment."

The figures on the slip were taken from the cashier's ledger. From these figures the directors could ascertain the state of the deposits on the day preceding the one on which their meeting was held, and could compare it with the same period or any other period in previous years, for the purpose of determining whether they were gaining or losing business, and, by calling for the cashier's ledger, they could ascertain what the state of the deposits was at any time they wished to know about.

According to the minute book, the directors made only two examinations of the bank during the period of a little over six years which is here under investigation. These examinations were made on November 16, 1908, and March 30, 1909. The master finds that other examinations were made than those which appear in the records, but when they were made or how many he does not state. The dividends were usually declared as of the 1st of April and the 1st of October, and the examinations, when made, were intended to take place before the dividends were declared. The dividends were in fact declared in 1907 on March 25th and September 30th; in 1908, on March 23d and September 28th; and in 1909 on March 30th and September 27th. So the examination which took place in the fall of 1908—November 10, 1908—was subsequent to the declaration of the dividend, and the examination which took place in the spring of 1909—March 30, 1909—was on the same day that the dividend was declared.

The testimony discloses that no examination was made by the directors in March, 1908, or in the fall of 1909. Mr. Barber, who was a director from 1907 to the close of the bank, thought he might have attended three examinations, and that he surely did the two of which there was a record. Mr. Sumner Dresser and Mr. Gale admitted that they had no recollection of an examination in 1907, unless the books showed one, and I find that in 1907, 1908, and 1909 no examinations were made beside those which the records disclose.

In making their examinations the directors did not inspect or examine the depositors' ledger kept by Coleman or compare it with the cashier's ledger to see if the balances due depositors corresponded.

"The examinations were confined to going over the cash and securities and checking them with the cashier's reports, verifying the accounts with the depositories as stated by the cashier, passing upon the worth of the securities and loans, with a view of deciding what should be crossed off and charged to the profit and loss account, and separating the cash into different kinds, as gold, silver, legal tender, notes, etc."

They took the amount due depositors upon the cashier's ledger as correct which was, in fact, inaccurate by the amount of Coleman's stealings.

The plaintiff contends that the directors were negligent so far as the examinations of the bank were concerned (1) in not making them every six months as their by-law provided they should be made, and (2) when an examination was made, in not examining the depositors' ledger to see whether the balance due depositors compared with the balance as shown on the cashier's ledger. In support of his position the plaintiff contends that the by-law has the force of a rule of law governing the conduct of the directors and that a failure to comply with it was per se negligent. On the other hand, the defendants contend that, inasmuch as the by-law was enacted by the board of directors, they could waive it, and that their failure to comply with it was a waiver.

It seems to me, however, that the only effect that should be given to the by-law is to treat it as a piece of evidence in the nature of an admission on the part of the directors as to what they regarded they were called upon to do in the performance of their duties in examining the bank. If the directors were not chargeable with knowledge of what the by-law called for, it seems to me that the fair inference is that they knew what it called for, inasmuch as they understood they were to make examinations twice a year. Under the by-law, they were required:

"To examine into the affairs of the bank, to count its cash, and compare its assets and liabilities with the balances on the general ledger, for the purpose of ascertaining whether or not the books are correctly kept, and the condition of the bank in a sound and solvent condition."

And, irrespective of the by-law, I find that due care on their part required them, in examining the bank, to compare the liabilities, as they appeared on the depositors' ledger at the time the examinations were made, with the cashier's ledger. The master finds, and the finding is not questioned, that they never looked at the depositors' ledger, which was the book upon which the chief liability of the bank was kept, and consequently never compared the liability as there shown with the balance due depositors on the cashier's ledger for the purpose of ascertaining whether or not the books were correctly kept.

If they had examined the depositors' ledger on September 27, 1909, the day they declared their last dividend, they would have found that a correct addition of the balance columns amounted to $388,830.04, and that, on comparing with the cashier's ledger, it exceeded the sum shown on that ledger as due depositors by $108,818.96—the sum due depositors, as it appeared on the cashier's ledger, being $280,011.08—and that an addition of Coleman's footings to the balance columns, as they appeared on that day, amounted to $363,435.08, and would not correspond with the cashier's ledger within $83,924, being that much in excess of the amount on that ledger. And, if they had looked at the footing of the balance column on page 11 for September 27th, they would have seen by a glance over the column that the footing was

altogether too small, and, if they had added the column, that the footing was $9,500 too small; and, had they looked at the footings of any of the balance columns on page 4, to which the individual balances had been extended, they would likewise have seen at a glance that the footings were too small. An addition of the balance columns on pages 2, 4, 5, 6, 7, 8, 9, and 13 would have shown that the footings were out of the way in sums varying from $400 to $9,500.

If, when they in fact examined the bank on March 30, 1909, they had examined the depositors' ledger, they would have found that a correct addition of the balance columns for that day would have amounted to $324,168.86, and that it exceeded the sum due depositors on the cashier's ledger by $13,145; the sum due depositors on the cashier's ledger being $311,023.86. An addition of the balance footings for this day would have corresponded with the cashier's ledger, but if they had looked at the footing of the column on page 11 for that day, they would have seen at a glance that the footing was several thousand dollars less than it should have been, and, had they added the column, that the footing was $8,000 too small. Incorrect additions appear on pages 1, 3, 4, 11, and 12 of the folio for that day; and there were, besides, seven dropped balances, four raised balances, and three incorrect extensions.

If, on November 16, 1908, when they examined the bank, they had looked at the depositors' ledger, they would have found that the balance columns for that day were correctly added, and that an addition of the balance footings corresponded with the sum due depositors as shown on the cashier's ledger. This was due to the fact that five days before, in extending the individual accounts in the Tuesday's balance columns, Coleman had dropped 27 balances, and in extending the balance footings he had made 13 incorrect extensions, one on each page except page 2. The 27 dropped balances made at that time amounted to $38,310. He was then preparing for the bank examiner, who came usually the last of November or the first of December.

If they had examined the depositors' ledger March 23, 1908, when they declared the dividend, they would have found that the addition of the balance columns for that day were incorrect, and would, on comparing it with the amount shown on the cashier's ledger as due depositors, have found it not to correspond within $17.68, but that an addition of the balance footings would correspond with the cashier's ledger. His stealings at this time were almost wholly concealed in the individual accounts. He was then, and had been since March 10th, carrying a dropped balance in the account of Edwin Dresser for $20,000, and had been carrying a dropped balance in the account of the Estate of Samuel Sanders since March 3d of $8,000.

If they had examined the depositors' ledger on September 30, 1907, when they declared their dividend, they would have found that a correct addition of the balance columns on that day exceeded the amount shown due depositors on the cashier's ledger by $27,000, and that a correct addition of the footings of the balance columns was $20,000 larger than the sum due depositors on the cashier's ledger; that the balance column on page 11 for that day was incorrectly added, the

footing being out of the way $2,000, and that the same was true of page 12, the footing being out of the way $5,000.

If they had examined the depositors' ledger on March 25, 1907, when they declared their dividend, they would have found that a correct addition of the balance columns for that day would exceed the sum due depositors .on the cashier's ledger by $7,330, but that the addition of the balance footings would correspond with the cashier's ledger. On page 4 the balance column for March 25th, was incorrectly added, being out of the way $6,325, and on page 11 the same column was out of the way $1,005. The check column was out of the way $1,000 on page 4.

If reasonable care in examining and comparing the depositors' ledger with the cashier's ledger required the directors to go no further than to add the balance footings for the day on which they made the examination, so that a comparison could be made, they could not be held responsible for losses from March 25, 1907, for on that day an addition of the balance footings would have corresponded with the sum due depositors on the cashier's ledger. But, if a reasonable performance of their duties required them to go further and make an addition of the balance columns, they might be held responsible for the losses from that time, for the addition of those columns would not correspond with the cashier's ledger. In their examination of September 30, 1907, however, they could be found to be derelict in both respects, for an addition of the balance footings would have shown a discrepancy of $20,000, and an addition of the columns would have shown a discrepancy of $27,000. The only time when the directors were called upon to examine the bank in these years that an addition of the balance columns and the balance footings would have been found correct was November 16, 1908.

In 1907 the deposits varied from $296,000 to $374,000. On January 1, 1907, they stood, at the end of the day, $325,544.28 and on December 31st at $314,991.16.

In 1908 the deposits ran from $276,000 to $357,000. On January 2, 1908, they stood at $334,797.98, and on December 31st at $331,201.43. While they were less at the end of the year by $3,596.55 than they were at the beginning of the year, they were greater than they were at the end of the previous year by $16,210.27.

In January, 1909, the deposits reached their highest point on the 18th of the month, when they were $388,536.97, and the lowest point on the 28th, when they were $315,965.03.

In February the highest point reached was $346,919.53 on February 9th, and the lowest $322,958.04 on February 25th.

In March the highest was $352,032.46 on March 16th, and the lowest was $311,023.86 on March 30th.

In April the highest was $336,854.58 on April 26th, and the lowest was $298,714.50 on April 13th.

In May the highest was $343,676.73 on May 4th, and the lowest was $299,393.33 on May 25th.

In June the highest was $322,383.15 on June 10th, and the lowest was $271,535.36 on June 29th.

In July the highest was $342,475.14 on July 27th, and the lowest was $274,040.75 on July 1st.

In August the highest was $345,236.50 on August 17th, and the lowest was $294,195.41 on August 30th.

In September the highest was $311,439.29 on September 16th, and the lowest was $271,349.50 on September 28th.

In October the highest was $286,686.43 on October 14th, and the lowest was $254,646.13 on October 26th.

In November the highest was $257,288.18 on November 1st, and the lowest was $173,979.13 on November 29th.

In December the highest was $172,829.20 on December 13th, and the lowest was $135,662.65 on December 28th.

In January, 1910, the highest was $181,947.33 on January 18th, and the lowest was $143,460.10 on January 31st.

In February the highest was $145,877.90 on February 1st, and the lowest was about $107,000 on February 21st, the day the bank closed.

In 1908 Coleman's monthly stealings ranged from $235 to $6,100, and during the year he stole $17,571.

In 1909 his monthly stealings ranged from $1,246.95 to $51,847. In September, October, November, and December his stealings amounted to $163,430.52, and his total stealings during the year were $226,-602.52.

In January, 1910, he stole $27,393.53, and in February $6,473.97, making his total stealings $310,143.02.

The master finds that "after September 1, 1909, the amount due depositors, according to the general ledger, passed the $300,000 mark on only three days, and gradually decreased, until November 1st it stood at $257,288.18"; that "from September 1st to the time the bank closed the decline was so steady that it became apparent the bank was going behind and the conditions were not normal. This became apparent to the cashier and the directors, and, as appeared in evidence, caused some discussion among and by them"; and that "after November 1, 1909, the decline was rapid." He also found that "in September or the early fall of 1909 the directors considered the question of the apparent shrinkage in the deposits in an effort to find a cause for it," and that after examining the figures from various public sources as to a decrease in deposits in New York banks and the published reports of other banks in Cambridge which seemed to them to indicate an increase in deposits in those banks, they came to the conclusion "that general conditions of business and the competition of new and younger institutions, making more attractive offers to depositors, were the cause." While he finds that they reached this conclusion in this way, he says:

"I do not find, as a matter of fact, that the things that they considered were the real reason, or that they were right in their conclusions, or fully and correctly informed as to some of the things that they considered as facts, but confine myself to the finding that they did make such effort to find explanation for the condition in their own bank which they realized existed."

The tables of the expert, which the master finds to be correct, show that on August 26, 1909, the deposits in the bank were $300,211.81,

as shown by the cashier's ledger, and that there were only four days after that when the deposits exceeded $300,000, to wit, September 7th, 8th, 16th, and 21st, and then only by a few thousand dollars; that all the rest of the time to the close of the bank they were less than $300,-000, and after November 1st less than $250,000. These tables also show that from the 1st of January, 1907, to the 1st of August, notwithstanding Coleman's stealings down to the 1st of August amounted to $18,100, the average deposits were about $350,000.

No evidence has been called to my attention, and I have been unable to find any in the case, showing that the directors made any other effort than that found by the master to ascertain the cause of this sudden shrinkage in the bank's deposits. They took no steps to examine the depositors' ledger, or to cause Mr. Earl, the cashier, to make an examination. The number of depositors was not falling off, and the daily deposits, instead of diminishing, were in fact increasing, and but for Coleman's stealings would have been over $400,000. The directors knew that the checks paid by the bank, whether they came in over the counter or through the mail from the Clearing House and the Boston banks, were kept each month in the bank until the close of the month, when the depositors' passbooks were balanced and the checks returned to the depositors, and they knew that those checks would show exactly who was drawing the money from the bank and the amounts that were being drawn out. The slips of the Clearing House and of the banks that cleared through the Clearing House, of the National Shawmut Bank, and of the First National Bank were kept in the bank, and had they, after the decline in the deposits became apparent, directed the cashier, before the checks were returned to depositors at the end of the month, to examine the checks and compare them with the slips and the depositors' ledger, to see if they were entered upon the ledger, it could have been found that in every month after August 26, 1909, and almost every day of the month from October 1, 1909, to the close of the year, checks were missing from those on file in the bank that appeared on the slips of the National Union Bank and were charged up on the Clearing House slip, and that the missing checks had not been charged up on the depositors' ledger on the days upon which they had been paid, or any day thereafter.

If, in the month of September, when the master finds they first took notice of the shrinkage in the deposits, they had made, or caused to be made, an examination of the checks on file, they would have found that on September 1st they paid a check that was put through the Clearing House by the National Union Bank for $600 and that it was missing; on September 8th, one for $3,200; on September 13th, one for $1,500; on September 22d, one for $5,000; on September 27th, one for $4,050; and on September 29th, one for $3,000.

In October, 1909, they would have found checks missing from their bank that came through the same channels as follows: October 1st, a check for $1,206; October 2d, for $205; October 4th, for $3,000; October 5th, $2,000; October 7th, $3,500; October 9th, $1,-000; October 12th, $400; October 13th, $3,500; October 14th, $3,-000; October 15th, $1,000; October 18th, $4,000; October 19th, $500;

October 20th, $4,000; October 22d, $5,100; October 23d, $2,000; October 25th, $1,800; October 26th, $1,971.08; October 27th, $4,000; October 29th, $2,500; October 30th, $2,600.

In November, 1909, they would have found checks missing amounting in all to $51,847, distributed through every day in the month with the exception of six, and in December, 1909, they would have found checks missing amounting to $45,956.44, distributed through every day in the month except six.

All of these checks were drawn by Coleman on the National City Bank in favor of his broker, deposited by the broker in the National Union Bank for collection, sent by the National Union Bank to the Clearing House, and by it to the National City Bank, and there taken out by Coleman and suppressed.

It seems inconceivable that men, who were aware that funds intrusted to their care were diminishing at an unprecedented rate, could be said to be exercising reasonable care in the performance of their duties by simply looking at the state of the New York banks, as reported in the Boston Herald, or the reports of the other banks in Cambridge showing the state of their deposits, and not looking at the checks in their own bank to see who was drawing out the money and the amounts, or making any examination of the depositors' ledger.

Mr. Richardson had been trained as a bank man. His father at one time was cashier of the National City Bank, and he had himself held the position of paying teller in the New England Trust Company for a good many years. Had he performed his duty, which he assumed when he took the oath of office as a director, and exercised reasonable care in its performance, he would have known that in the semiannual examinations of the bank the depositors' ledger was not consulted for the purpose of ascertaining whether the liabilities there shown corresponded with the balance due depositors on the cashier's ledger, and would have known of the abnormal shrinkage in the bank's deposits after August 26, 1909. If his physical incapacity to attend the meetings of the directors from the 1st of April to the 1st of September, 1909, would be a sufficient justification for his failure to attend during that period, it is no justification for his failure to attend the meetings of directors after September 1st, as the evidence discloses that he went to his place of business through September, October, November, and December of that year. Moreover, the evidence discloses that when he assumed the duties of director he did not intend to attend the meetings of directors and his performance in that respect shows a substantial compliance with his intention. Under the circumstances, he stands no different with respect to his failure of duty than do the other directors.

As hereinbefore stated, Coleman from early in 1907 to the close of the bank, during which period substantially all his stealings took place, was gambling in stocks through brokerage firms in Boston, was spending money freely in hotels and restaurants in that city, and was generally leading a fast life. He bought an automobile in 1907, for which he paid $800, and in 1909 turned in his old machine and procured a new one; he often went to the bank in the automobile and

left it standing in front of the bank; and there was a rumor current in Cambridge that he was keeping a woman. At no time while he was employed by the bank did he receive more than $12 a week. It is true that during a portion of the time after he obtained an automobile he was an agent for the sale of automobiles and sold three on commission, and that in the summer of 1909 he became the treasurer of an automobile company, receiving for his services as treasurer $50 a month. It also appeared that in the summer of 1909 Lockhart, who had been a messenger in the bank up to about the close of 1907, entered the employ of Coleman at $15 a week. Just what his duties were other than driving Coleman's automobile from the automobile works to the automobile office in Boston and taking checks for Coleman, which he had drawn on the National City Bank, to his brokers in Boston, the evidence fails to disclose.

The master finds that in 1904 and 1905, during the period when Roaf, Bragg, and Cutting were tellers, there were shortages in the teller's cash, the reason for which they were not able to locate, and that, when Mr. Cutting left, he denied that those which occurred during his term of service were due to any mistakes on his part, and told Mr. Edwin Dresser in substance that "somebody in this bank had stolen the money, and if you will give me a chance I will set a trap and catch the man." Mr. Dresser said that he did not think any one stole the money, and that the shortages occurred through errors in handling the cash.

After Earl became cashier, and while Coleman was employed in the bank, and prior to February, 1908, a package of money containing $150, which was left in the bank by a Mr. Fillmore for safe-keeping, was lost or stolen. In February, 1908, Mr. Fillmore called for the package. A search was instituted, but it could not be found, and when Mr. Fillmore, who had been in the West for a time, called again at the bank in April and July he was so informed. After this Mr. Fillmore had one or two conversations with Mr. Edwin Dresser in regard to the matter, and, nothing being done in the way of restoring the funds, on September 29, 1908, he sent a letter to Mr. Edwin Dresser, as president of the National City Bank, which letter is given in full in the master's report at pages 75 and 76, in which he set forth in detail the circumstances with regard to the package of money, how it came to be left at the bank, and how it could not be found, and requesting Mr. Dresser to bring the matter before the board of directors. About the last of October, 1908, after he had written the letter, he had a conversation with Mr. Dresser about the matter and in the course of the conversation with him said:

"I told him it was very evident there was a thief in the bank, that the money had been stolen. I said: 'I would advise you to look after Coleman, for I believe that he is living a pretty fast pace, and I have pretty good authority for believing that he is supporting a woman.'"

To which statement Mr. Dresser made no reply. Mr. Dresser did not present the letter to the directors, and never reported to any of them what Mr. Fillmore told him about Coleman.

On October 29, 1908, when Mr. Dresser received this warning from Mr. Fillmore, an examination of the depositors' ledger would have shown that a correct addition of the balance columns exceeded the sum due depositors on the cashier's ledger by $46,310, and that an addition of Coleman's balance footings on that day would have exceeded the amount due depositors on the cashier's ledger by $37,250, and the same is true of the days immediately preceding and following October 29th.

About the 23d of February, 1909, Mr. Dresser called at the office of a Mr. Campbell in Boston. Mr. Campbell was a lawyer and lived in Cambridge. Mr. Dresser had a note which the bank held against Campbell's father, and he called for the purpose of getting Campbell to indorse the note. Campbell declined to indorse the note, saying, in substance, that the bank did not need any money, that its young men were riding around in automobiles, to which Mr. Dresser replied that he did not ride in an automobile, and Mr. Campbell's answer was:

"Well, if I had somebody working for me, and I was walking and he was riding, I should probably find out where he got his car."

About the middle of August, 1909, Mr. Lombard, a depositor in the bank, told Earl that Coleman was running around with a woman in his automobile, and he understood he was keeping this woman. Earl told Dresser of this, adding that the woman they referred to was probably the Miss Taylor that they reported he was engaged to and was going to marry.

There was also evidence that Coleman was in the habit of ordering stocks over the telephone which was in the banking room, and that he frequently spoke to Mr. Edwin Dresser about stocks. Mr. Dresser admitted that Coleman said to him at one time that he was going to buy or sell some copper stock.

Mr. Dresser never reported any of these matters to the board of directors, or took any steps to investigate Coleman's life outside of the bank, or the manner in which he kept his ledger.

Mr. Edwin Dresser knew that Coleman took charge of the checks coming from the Clearing House. Earl testified that Dresser repeatedly saw Coleman handling the clearings, and the checks presented in evidence show that at times Coleman made out the draft on the National Shawmut Bank to pay the Clearing House demand and that Edwin Dresser signed the check, and on these very occasions the amount of the checks drawn to pay the Clearing House included checks drawn by Coleman on the National City Bank which Coleman had suppressed. For instance, on November 10, 1909, Edwin Dresser signed a check on the National Shawmut Bank to pay the Clearing House demand for $5,260.98, the body of which was in Coleman's handwriting. This check went, in part, to pay a check of Coleman's that was sent through the Clearing House amounting to $1,000. On November 11, 1909, a check similarly drawn and signed, the body of the check being in Coleman's handwriting, for $13,933.32, went to pay a check of Coleman's for $3,500 that was sent through the Clearing House. And on January 10, 1910, Mr. Edwin Dresser signed a check similarly

drawn, the body of which was in Mr. Coleman's handwriting, for $5,-457.28, that went to pay a check of Coleman's for $3,000 that had come through the Clearing House.

These checks were a part of the 56 exhibits presented in evidence as samples of the method pursued by Coleman in getting money out of the bank and show the slip of the National Union Bank and the Clearing House slip, from which it appears that the amount of the checks sent by the National Union Bank through the Clearing House was the largest of the Boston banks that cleared checks drawn on the National City Bank through the Clearing House in every instance except three, and in two of these it was the second, and in the other the third largest.

Mr. Edwin Dresser testified that he knew the system by which the deposit ledger was kept, and it is hardly conceivable, in view of his long experience as president and director of the bank, and his daily attendance at the bank in the management and direction of its business, that he should not know the principle of the book, and be capable, if he saw fit, of finding and adding the balance columns or the balance footings for any given day. He knew that the depositors' ledger was an important book and needed to be correctly kept. That it was unsafe to let it go for a single day with errors not found was brought to his attention by a letter dated August 3, 1903, written by Mr. Wright, an auditor employed at that time by the directors to audit the accounts of the bank, when making a report of his examination. This was a matter in regard to which Mr. Gale and Mr. Sumner Dresser had like information.

In the summer of 1909, Dr. Wetherbee, who lived near the bank, told Mr. Barber that he did not think it looked very well to have the automobile in front of the bank so much.

Along in the middle of November, 1909, and about three months before the bank failed, in an interview between Mr. Barber and Mr. Bullard, president of the Harvard Trust Company, in regard to a possible sale of the National City Bank to the Trust Company, the master finds that the following conversation took place:

Mr. Bullard "told Mr. Barber that he thought the business of the City Bank was leaving it rapidly; that Mr. Barber replied that he didn't think so; that the depositors were all staying with the bank, and that, although the deposits had run down, he couldn't account for it; that he asked Mr. Barber if he had entire confidence in all the officers and clerks in the bank, and that Mr. Barber said, 'Yes;' that witness (Bullard) then said it had currently been reported among his clerks that one of his officers was frequenting bucket shops in Boston and was evidently living pretty fast; that he did not mention names; that Mr. Barber replied, 'I don't think that is so; I don't think that can be so.' "

Barber did not ask Bullard who the officer or clerk was, did not report the conversation to the other directors, and took no steps to ascertain whether it was true or false.

Counsel for the defendants, in their arguments, placed much reliance upon the fact that the directors knew the national bank examiners examined the bank twice a year, and that, because of this, they, as

reasonable men, in the performance of their duties, would not be called upon to have an audit of the bank made, or to make regular semi-annual examinations themselves before declaring dividends. Their position was, in a large measure, that the irregularities and defalcations of Coleman could not have been ascertained without an audit of his ledger and the calling in of the depositors' passbooks, and that they were not required to take such action, in the absence of some special occurrence coming to their attention leading them to believe that an audit was necessary, and that, under the facts in this case, no such occurrence was brought to their attention.

The directors knew that the national bank examiners examined the bank twice a year. They knew that only one examiner at a time made the examination, and Mr. Edwin Dresser knew that the time allotted to the examination of the depositors' ledger was very brief. The other directors had no knowledge of the time allotted to the depositors' ledger, but in a general way knew that the time consumed in making the entire examination was but a portion of a day. Mr. Edwin Dresser, Sumner Dresser, and Mr. Gale must have known that the examination made by the bank examiner was not the equivalent of an audit, for they were directors in 1903 when they caused an audit to be made, and that it took from 12 to 14 days for two men to make it, and, while the directors, as a board, were not aware of the warnings regarding Mr. Coleman, which were brought to the attention of Mr. Edwin Dresser and Mr. Barber, and their knowledge that examinations were made by national bank examiners may have been a sufficient justification for their not causing an audit to be made, it was not a justification for their failure to perform their duty to examine the bank twice a year before declaring dividends. And it would seem very doubtful whether it should be regarded as a justification for their failure to cause an audit to be made in September, 1909, when they were aware the shrinkage in their deposits was abnormal; but, however this may be, it seems to me, and I find, that the defendants were negligent in not making examinations of the bank twice a year, and in not ascertaining, when such examinations were made, whether the liabilities of the bank, as they appeared on the depositors' ledger, corresponded with the balance due depositors on the cashier's ledger, and that, had they made such an examination September 30, 1907, and only added the balance footings for the purpose of making a comparison, they would have ascertained Coleman's irregularities, and, not having done so, they are responsible for his defalcations after that date.

I find, also, that if, in September, 1909, they had exercised reasonable care when they knew that the shrinkage in the deposits of the bank were abnormal, and had called for and examined the checks that were in the bank, they would have discovered that large checks appearing on the slips of the National Union Bank were missing, and would have learned of Coleman's irregularities, and are responsible for his defalcations after a reasonable time had elapsed for making such inquiry, and that a reasonable time for this purpose had elapsed at the end of September, 1909.

As to Edwin Dresser, I find that he was negligent in failing to report to the directors the Fillmore letter, and particularly so in his failure to report to them the conversation had with Mr. Fillmore in the last part of October, 1908, in which Fillmore charged that there was a thief in the bank, and told Dresser about Coleman's conduct, and that he better look after him; that he was negligent in failing to make an investigation of Coleman and his affairs as a result of this information; that, had he exercised reasonable care in this respect, Coleman's irregularities would have been discovered, and his defalcations thereafter prevented; that a reasonable time for making such investigation would have elapsed by the close of November, 1908; and that he is responsible for Coleman's defalcations after that time.

As to Mr. Barber, I find that he was negligent in giving no heed to Bullard's warning in November, 1909; that he could not, in the exercise of reasonable prudence, have regarded what Mr. Bullard told him as mere trader's talk, and that, had he taken steps to ascertain who the official or clerk in the National City Bank was with reference to whom Mr. Bullard was speaking, he would have learned that it was Coleman; that due diligence in investigating Coleman's affairs would have revealed his defalcations; that a reasonable time for making the investigation would have elapsed by December 1, 1909; and that he is responsible for his defalcations after that date.

Much time was taken up in the argument of the case in discussing the competency of Mr. Earl, as bearing upon the question whether the directors were negligent (1) in employing him in the first instance, and (2) in retaining him in their employ. The master, in his report, disposes of this question of negligence by finding that Earl was competent. I am unable to find that the directors were negligent in the original employment of Earl. He worked in the bank some six months when Mr. Davis was cashier, doing the work of teller, book- keeper, and cashier, and was recommended by Mr. Davis, who was himself a director, as a suitable and competent man for the position. After he had been cashier for about three or four years, he seems to have become very lax, and to have exercised little supervision over the work intrusted to his subordinates. Possessed of his knowledge and intelligence, it would seem that, if he had exercised the slightest care in supervising Coleman in the handling of the Clearing House checks and in the keeping of the depositors' ledger, the greater portion of the defalcation never would have taken place. But whether the directors were negligent in retaining him I regard of little importance, in view of the findings made.

[4] Since this proceeding was begun George F. Richardson and Edwin Dresser have died. The death of Mr. Richardson took place prior to the hearings before the master. The administrators of his estate have appeared and defended the suit.

The death of Edwin Dresser took place after the hearing was had before the court on the master's report. Sumner Dresser has been appointed administrator of his estate and has been cited to appear in the cause. He has appeared specially and filed a motion to dismiss the

suit as against him on the ground that it did not survive. The motion was denied, and he was ordered to appear generally.

The question of the survivorship of an action of the character of the one in question has been before the Circuit Court for this district at least twice, and it was held that the action survives. Allen v. Luke, 163 Fed. 1018, 1020; Id., 141 Fed. 694, 697. The cases relied upon in reaching this conclusion were Boyd v. Schneider, 131 Fed. 224, 229, 65 C. C. A. 209; Stephens v. Overstolz (C. C.) 43 Fed. 465, and Warren v. Para Rubber Shoe Co., 166 Mass. 97, 44 N. E. 112.

The same question has recently been considered in Curtis v. Phelps (D. C.) 208 Fed. 577.

The ground upon which these cases seem to proceed is that the directors of a national bank, in entering upon their duties as such officers, impliedly agree to properly and faithfully perform them, and if by misconduct or negligence they fail in this respect, and damage ensues, a cause of action arises which the receiver may enforce for the benefit of the stockholders and creditors; that the cause of action is ex contractu, rather than ex delicto, and, because of this, survives.

This is apparently the ground upon which a like conclusion was reached in the following cases, although in them it was said that a "fiduciary relation" exists between the corporation and its directors, and that for a failure to perform duties arising out of such relation the remedy will survive; it being regarded as an exception to the maxim "Actio personalis moritur cum persona." Charitable Corporation v. Sutton, 2 Atk. 400; Concha v. Murrieta, 40 Ch. D. 443; Warren v. Para Shoe Co., 166 Mass. 97, 104, 44 N. E. 112.

The foregoing embodies my findings of fact and rulings of law in this case. So far as the findings and rulings of the master are consistent with or are embodied in my findings, they are affirmed; but, so far as they are repugnant to or inconsistent with them, I find that they are clearly against the weight of the evidence, or so inconsistent with other facts found by him and herein affirmed, that they cannot stand.

The clerk will prepare three decrees—one against George W. Gale, David A. Barber, and Sumner Dresser jointly, one against Sumner Dresser, administrator of the estate of Edwin Dresser, and one against the administrators with the will annexed of George E. Richardson; and in each decree the damages will be the amount of Coleman's defalcations after September 30, 1907, to the close of the bank, with costs. See Von Arnim v. Am. Tube Works, 188 Mass. 515, 14 N. E. 680; Allen v. Luke (C. C.) 163 Fed. 1018, 1021.

NOTE.—The amount of the decree against the several defendants, covering the thefts of Coleman after September 30, 1907, was $282,043.02.