## HARRIMAN NATIONAL BANK OF NEW YORK v. SELDOMRIDGE, AS RECEIVER OF THE MERCANTILE NATIONAL BANK OF PUEBLO, COLORADO.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 173.  Argued January 31, 1919.—Decided March 3, 1919.

A, the cashier of the M. National Bank and in control of its affairs, acting in the name of B, its president, by correspondence induced the H. National Bank to agree to lend B a sum of money to be secured by the joint note of A and B and certain collateral. A then bought certain shares from T, with a check on the M. Bank signed with B's name, and forwarded by mail to the H. Bank a forged note and collaterals in apparent compliance with the loan agreement, upon receipt of which the H. Bank credited B with the amount agreed on; but in the meantime the check to T had been paid by the M. Bank, and A, to meet it, had made a slip falsely purporting to show a deposit there by B of a check on the H. Bank for the amount of the proposed loan.  Having at first credited B with the amount of the loan, the H. Bank, under instructions sent by A in the names of the M. Bank and of B, respectively, made book-keeping entries transferring the credit to the M. Bank, and later, upon receiving notice from B to cancel A's authority to act for the M. Bank, made further entries withdrawing the credit from the

M. Bank's account; and still later, upon learning that the M. Bank had failed, made additional entries to cancel the loan. B repudiated A's action and denied liability. *Held:* (1) That, as against the M. Bank, the H. Bank had the right to rescind and cancel the loan agreement for failure to comply with its conditions and for the fraud; (2) that the payment of the check to T and the making of the fraudulent deposit to meet it, having occurred before the H. Bank received the note and collateral or made any entry on its books, could not subject it to liability in favor of the M. Bank; (3) that the bookkeeping entries made by the H. Bank could not create such liability, in the absence of any consideration moving to it from the M. Bank, and in the absence of any ground for estoppel. P. 10.

240 Fed. Rep. 111, reversed.

THE case is stated in the opinion.

*Mr. Charles E. Hughes,* with whom *Mr. Bertram L. Kraus* was on the brief, for plaintiff in error:

The credit was obtained by fraud, the collateral security being forged, and hence the defendant was entitled to rescind. The evidence clearly shows that the note itself and the powers of attorney for transfer of the certificates of stock were forged. In view of the forged collateral, it makes no difference whether W. B. Slaughter authorized his signature and thus became a party to the note or not. *Bradley* v. *Seaboard National Bank,* 167 N. Y. 427; *Flatow* v. *Jefferson Bank,* 135 App. Div. 24; *Mann* v. *Franklin Trust Co.,* 158 App. Div. 491.

On the transfer of the credit, the Mercantile Bank took subject to all equities. It had no standing superior to that of the Slaughters. There was no negotiable paper used; the transfer was merely a book entry of credit. The suggestion of an account stated between the Mercantile Bank and the defendant is unavailing. The former was simply the transferee of a chose in action created through fraud. An account stated may be opened on proof of fraud or mistake. *Lockwood* v. *Thorne,* 18 N. Y. 285, 292. See also *Greenhalgh Co.* v. *Farmers National Bank,* 226

Pa. St. 184; *Shipman* y. *Bank of State of New York,* 126 N. Y. 318, 327; *Talcott* v. *First National Bank,* 53 Kansas, 480; *Curry* v. *Wisconsin National Bank,* 149 Wisconsin, 413; *First National Bank* v. *Whitman,* 94 U. S. 343, 346. Mere book entries do not create an obligation. *Rankin* v. *City National Bank,* 208 U. S. 541, 545, 546; *Cherry* v. *City National Bank,* 144 Fed. Rep. 587; *Kendrick State Bank* v. *First National Bank of Portland,* 213 Fed. Rep. 610; *Modern Woodmen of America* v. *Union National Bank,* 108 Fed. Rep. 753; *Talcott* v. *First National Bank, supra.*

The defendant is not estopped from showing the fraud and denying liability. Even if the payment had been made upon the faith of a representation by the defendant that it would make the loan or extend the credit, the representation being explicitly conditioned upon the receipt of described collateral, the defendant could not be held on the delivery of forged collateral. To base an estoppel, the representation must be taken as it is made. There was no payment which changed the position of the Mercantile Bank. The defendant is thus clearly entitled to rescind, both as against the Slaughters and the Mercantile Bank; and there is no basis for the finding of estoppel. *Selover* v. *First National Bank,* 77 Minnesota, 140. The receiver contends that if W. B. Slaughter had drawn a check against the amount credited to him and given the check to the Mercantile Bank which had been paid, the latter could have retained the avails of the check, citing *American National Bank* v. *Miller,* 185 Fed. Rep. 338; 229 U. S. 517; *National Bank* v. *Burkhardt,* 100 U. S. 686. But this introduces a question of negotiable paper.

C. C. Slaughter was acting for the bank; he had no interest adverse to the bank; it was a transaction in fraud of the defendant but not in fraud of the Mercantile Bank. If the bank is to take the benefit of the act of its agent it

must take the burden of what the agent knows at the time of the transaction. *The Distilled Spirits*, 11 Wall. 356, 366–368; *Ditty* v. *Dominion National Bank*, 75 Fed. Rep. 769; *Aldrich* v. *Chemical National Bank*, 176 U. S. 618, 633, 634; *Holden* v. *New York & Erie Bank*, 72 N. Y. 286. . The receiver stands in no better position than the bank. *Rankin* v. *City National Bank*, 208 U. S. 541.

*Mr. Stuart G. Gibboney*, with whom *Mr. William A. Barber* and *Mr. George M. Burditt* were on the brief, for defendant in error:

The Mercantile Bank, having to its credit $53,000, was entitled to use the money as it saw fit unless it was guilty of fraud, and the defendant was bound to retain that amount and to pay it out only upon the order of the Mercantile Bank. Concededly the defendant withdrew $30,000 without any such order. A bank cannot discharge its liability to a depositor except by payment to him or on his written order. *Leather Manufacturers' Bank* v. *Merchants' Bank*, 128 U. S. 26.

. The statement sent to the Mercantile Bank showing the credit was binding upon the defendant unless there was some mutual mistake or fraud. *Leather Manufacturers' Bank* v. *Morgan*, 117 U. S. 96; *Daintry* v. *Evans*, 148 App. Div. 275. No mistake on the part of the Mercantile Bank has been shown. The evidence shows that it was the practice of C. C. Slaughter to draw checks against his father's account, to which the latter never objected. The Mercantile Bank had no knowledge of the loan agreement, nor did it rely upon any such agreement. The only knowledge it had was the deposit ticket and the subsequent information from the defendant that the $30,000 had been placed to its credit. The transfer of the credit had the same effect as would the deposit of cash. The case is like *American National Bank* v. *Miller*, 229 U. S. 517, where it was held that the collection of a

check and crediting by a bank on which the check is drawn, in the absence of fraud or mistake, constitutes payment. See also *National Bank* v. *Burkhardt*, 100 U. S. 686; *Oddie* v. *National City Bank*, 45 N. Y. 735. The fact that the Mercantile Bank did not forward a check signed by W. B. Slaughter is immaterial. It had his authority, his assignment, in the form of a deposit ticket; it paid out all of the funds for his benefit. The defendant accepted a telegram as sufficient authority for the transfer. Both banks acted in good faith. Care upon defendant's part would have saved the situation.

The knowledge of C. C. Slaughter cannot be imputed to the Mercantile Bank, because the Slaughters were acting in their individual capacities, in a transaction in which they were personally interested, and their interests were adverse to those of the bank. *American National Bank* v. *Miller, supra; American Surety Co.* v. *Pauly,* 170 U. S. 133, 156; *Levy & Cohn Co.* v. *Kaufman,* 114 Fed. Rep. 170; *Bank of Overton* v. *Thompson,* 118 Fed. Rep. 798; *Hilliard* v. *Lyons,* 180 Fed. Rep. 685; *In re United States Hair Co.,* 239 Fed. Rep. 703. The Mercantile Bank did not derive its right to the $30,000 by any connection with the loan, but by paying out its money on the order of W. B. Slaughter's agent, on the assertion that the amount had been deposited to its credit in the defendant bank.

While the defendant was entitled to rescind as against the Slaughters because of the fraud, this is not true as to the Mercantile Bank, which had become the owner of those funds for value without notice. The book entries are only evidence of the happening of a specific event—the transfer from W. B. Slaughter's account to that of the Mercantile Bank of $30,000. That is just as real as if the defendant had handed to the Mercantile Bank $30,000 in cash.

The cases cited to the effect that mere book entries do

not create an obligation are inapplicable here. Those were cases where the original parties were still the ones in interest, and there were no third parties who had, without notice and for value, parted with a thing of value. The Mercantile Bank is not now seeking to retain a gain by reason of the transaction, as in *Selover* v. *First National Bank*, 77 Minnesota, 110, but to recoup its loss brought about by the extreme negligence of the defendant. In *The Distilled Spirits Case*, 11 Wall. 356, the agent had no interest adverse to that of the principal. In *Ditty* v. *Dominion National Bank*, 75 Fed. Rep. 769; *Aldrich* v. *Chemical National Bank*, 176 U. S. 618; and *Holden* v. *New York & Erie Bank*, 72 N. Y. 286, the bank had derived a specific benefit from the transaction which it was seeking to hold.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

Following the failure in March, 1915, of the Mercantile National Bank of Pueblo, Colorado, the Receiver appointed by the Comptroller commenced this suit to recover from the Harriman National Bank of New York City $30,000, alleged to be due to the Mercantile Bank. On issue joined before a jury, the court, after refusing a request of the Harriman National Bank for a peremptory instruction directing a verdict in its favor, granted a request of like character made by the Receiver, and a judgment on the resulting verdict for the amount claimed was entered.

The case is before us on error to the judgment of the court below affirming that of the trial court, our jurisdiction to review resulting because the case from its inception involved the enforcement of the National Banking Act, and therefore, was not dependent in the trial court solely upon diversity of citizenship. *Auten* v.

*United States National Bank*, 174 U. S. 125, 141; *International Trust Co.* v. *Weeks*, 203 U. S. 364, 366.

The case is this. W. B. Slaughter, through stock ownership, controlled the Mercantile National Bank of Pueblo, Colorado. He was president and his son, C. C. Slaughter, was cashier. Prior to 1915, Slaughter, the president, removed his residence from Pueblo to Texas, engaging there in the cattle business and leaving his son, the cashier in complete control of the Mercantile Bank and of all its affairs. W. B. Slaughter was also the president of the Silverton National Bank of Silverton, Colorado, and controlled the affairs of that bank by the ownership of a majority of its stock. At Silverton there was another national bank carrying on business, the First National, the majority of whose stock was owned by one Thatcher.

The correspondent of the Mercantile Bank in New York City was the Harriman National, with which it had a checking account. On January 28, 1915, C. C. Slaughter, the cashier of the Mercantile, dictated a letter to the Harriman which was dated at Pueblo and written on the letterhead of the Mercantile Bank, purporting to be from W. B. Slaughter, whose signature was affixed by a rubber stamp. By this letter its assumed writer, after referring to his ownership and control of the Silverton National, stated his purpose to buy out the interest of Thatcher in the First National Bank of Silverton and after doing so to consolidate the two banks, and requested a loan of $30,000 to enable him to accomplish the purpose. It was stated that it was proposed to evidence the loan by a note at sixty days, to be signed by the writer, W. B. Slaughter, and by his son C. C. Slaughter, if the bank so desired, and to secure the note by the pledge of 500 shares of the Mercantile and 400 shares of the First National of Silverton. The Harriman Bank received this letter on the first of February and at once telegraphed W. B. Slaughter, president of the Mercantile Bank at Pueblo,

that, whenever desired, the Harriman would be willing to make the loan, as requested. On the same day the bank wrote a letter to W. B. Slaughter, president at Pueblo, but marked it personal, repeating and confirming the telegram, and inclosing a blank form of collateral note to be executed and sent to the bank with the collateral when the money was desired.

The telegram of the first of February announcing the willingness of the Harriman Bank to make the loan having come into the hands of C. C. Slaughter on the day it was sent, he ordered a seal to be made which he said was intended as the seal of the First National Bank of Silverton, and on the fifth of February bought from a printer blank forms of certificates of stock. On the next day, Saturday the 6th, purporting to act as agent of W. B. Slaughter, C. C. Slaughter bought from Thatcher his interest in the First National of Silverton, and gave a check in the name of W. B. Slaughter and as his representative, on the Mercantile National, for $35,000 in part payment. On Sunday, February 7th, C. C. Slaughter caused a letter to be prepared falsely purporting to be written and signed by W. B. Slaughter, acknowledging the receipt of the telegram sent by the Harriman Bank on the first and asking that the loan be consummated. In this letter there was returned the collateral note which the bank had sent for execution, along with the promised collateral, that is, certificates for 400 shares of the First National of Silverton and 500 shares of the Mercantile at Pueblo. The signature of W. B. Slaughter to the note was forged and the collaterals were also forged, the first, the certificates of the Silverton Bank stock, because they were fabricated by the use of the printed certificates and seal which had been acquired a few days before and described shares which had no existence, and the second, the Mercantile Bank stock, because, although the certificates represented stock standing in the name of W. B. Slaughter on the

books of that bank, the powers of attorney purporting to have been given by W. B. Slaughter to enable them to be transferred to the Harriman Bank, were forged.

To meet the check for $35,000 given on Saturday for the Thatcher purchase, on Monday morning, February 8th, C. C. Slaughter made out a deposit slip to show the deposit by W. B. Slaughter of a check on the Harriman National for $30,000, although no such check was in fact deposited; and on that day the check in favor of Thatcher for $35,000 was paid and debited by the Mercantile to W. B. Slaughter's account. The letter of the seventh sending the note to the Harriman reached that bank on the tenth and, complying with the request it contained, a credit in favor of W. B. Slaughter for $30,000, the amount covered by the loan, was entered by the Harriman on its books.

On the seventeenth of February the Mercantile Bank overdrew its account in the Harriman to the extent of $8,000, which that bank honored. It, however, telegraphed the Mercantile, calling attention to the overdraft and asked whether a remittance to cover it had been made. The telegram, moreover, referred to the $30,000 credit in favor of W. B. Slaughter and asked whether possibly it was intended that the amount of the loan credit should be placed to the account of the bank. In reply, C. C. Slaughter dictated a telegram in the name of the Mercantile Bank instructing that the amount of the credit of W. B. Slaughter be transferred to the credit of the Mercantile. On the receipt of this telegram the Harriman made the necessary bookkeeping entries to transfer the credit of $30,000 from the account of W. B. Slaughter to that of the Mercantile National Bank. On the next day, the eighteenth, however, the Harriman wrote W. B. Slaughter, Mercantile National Bank, Pueblo, informing him of the instructions they had received from C. C. Slaughter and what they had done under them, and ask-

ing the former's approval. This letter was replied to on February 22d by C. C. Slaughter confirming his previous telegram and saying that the original intention was that the money borrowed should go to the credit of the Mercantile Bank for the use of W. B. Slaughter.

Thus things stood until the twenty-third of March, when the Harriman received a telegram from W. B. Slaughter, president of the Mercantile Bank, telling them to cancel all authority of C. C. Slaughter to act as an officer of the Mercantile because he had resigned. The Harriman thereupon telegraphed and wrote W. B. Slaughter, informing him of what had transpired on the subject of the credit for the loan under the note and its transfer, and saying that as he had given no personal instructions on the subject, they had made bookkeeping entries taking the $30,000 out of the account of the Mercantile so as to hold it for a full understanding of the situation; and when, a few days later, the Harriman learned of the failure of the Mercantile, such entries were made as to cancel the loan without diminishing or changing the credits which otherwise existed in favor of the Mercantile.

Subsequently W. B. Slaughter notified the Harriman that he had never applied for the loan in question, or signed the note which evidenced it, and denied all liability. The appointment of the Receiver and the bringing of the suit which we have stated at the outset followed in due season.

Passing the fact that both parties to the loan agreement, the Harriman Bank on the one side and W. B. Slaughter on the other, insist, although for different reasons, that the loan agreement has no existence, there nevertheless can be no room for dispute that such contract, by the failure to comply with its conditions and by the fraud and forgery committed concerning the collaterals as between the parties to it and those in privity, was rightly canceled and can be the source of no obligation against

the Harriman Bank. The right of the Mercantile Bank as here asserted, if it has any existence, must rest, therefore, not in the loan agreement, but on some condition or consideration extraneous to that contract creating as against the Harriman and in favor of the Mercantile the duty to pay the amount which both the courts below awarded.

No semblance of ground, however, supporting that view results from the undisputed facts which we have stated unless it can be sustained from two considerations: (1) the payment which was made by the Mercantile on February 8th of the check purporting to be drawn by W. B. Slaughter in favor of Thatcher and the making by C. C. Slaughter on the eighth of the fraudulent and false deposit slip purporting to show the deposit on that day by W. B. Slaughter of a check drawn by him on the Harriman for $30,000; and (2) the bookkeeping entries which were made by the Harriman on the eighteenth transferring the credit for the amount of the agreed loan from the account of W. B. Slaughter to that of the Mercantile Bank. But a moment's thought demonstrates that the circumstances referred to cannot possibly sustain the conclusions stated. This is true as to the first because both the payment of the check by the Mercantile and the making of the false deposit slip took place before the Harriman had even received the collateral note or made any entry on its books concerning the same; and the second because the mere bookkeeping entry made by the Harriman of credit to the Mercantile, in the very nature of things, was incapable alone of conferring rights on the Mercantile to which it was not otherwise entitled, especially in the absence of all consideration moving from the Mercantile to the Harriman and the non-existence of any condition upon which to base even the pretext of estoppel in favor of the Mercantile as against the Harriman resulting from action taken by the former upon the faith of the book-

keeping credit. Indeed, when the reasoning upon which the relief below was awarded is considered, and the arguments pressed at bar sustaining that result are weighed, they all at last come to the assumption that by some undisclosed process the Mercantile Bank was entitled to enforce as against the Harriman the contract for the loan agreement made with W. B. Slaughter, without the duty to comply with the obligations of that contract, and therefore became possessed of the power to enforce the contract against the Harriman despite the fraud and forgery practiced upon the Harriman in the attempt which was made to procure the benefits of the loan agreement.

It follows that the judgment of the Circuit Court of Appeals and that of the District Court must be and they are reversed, and the case be remanded to the District Court with instructions, that after setting aside its judgment, it take such further proceedings as may be in conformity with this opinion.

*And it is so ordered.*